UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____x
JANE DOE, et al.,

                          Plaintiffs,                 1:20-CV-0840
                                                                             (BKS)(CFH)

   - against -

HOWARD ZUCKER, in his official capacity
as Commissioner of Health for the New York State
Department of Health, et al.,

                          Defendants.
_____x
STATE OF NEW YORK    )
COUNTY OF ALBANY    ) ss.:

**ELIZABETH RAUSCH-PHUNG, MD, MPH**, declares under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true:

        1.     I am the Director of the Bureau of Immunization, New York State Department of Health (Department). I have been employed by the Department for over 10 years. I direct the Bureau of Immunization, which implements the federal Immunization and Vaccines for Children cooperative agreement for New York State outside of New York City ("NYC") and oversees efforts to improve immunization coverage and prevent vaccine-preventable diseases among New Yorkers of all ages. The Bureau of Immunization is located within the Department's Division of Epidemiology.

        2.     I received my M.D. degree from the State University of New York, Upstate Medical University in 2003 and completed a residency in preventive medicine and a Master of Public Health degree in 2009. I have been licensed to practice medicine in New York State since 2008. I am currently board-certified in Preventive Medicine.

        3.     I am familiar with the facts set forth herein based on personal knowledge and expertise, discussions with Department staff and Department records.

## **RELEVANT REGULATIONS**

4. Public Health Law § 2164 requires children to be vaccinated to attend school. This statute was enacted to protect not only children but also the public at large. Title 10, Subpart 66-1, provides the requirements for pursuing a medical exemption from the immunization requirements of Public Health Law § 2164.

5. Public Health Law § 2164(8) states that medical exemptions may only be issued by a "physician licensed to practice medicine in this state." This provision has always been strictly interpreted- medical exemptions can only be deemed valid if from a physician, rather than a physician assistant or nurse practitioner.

6. On August 16, 2019, the Department and the New York State Office of Children and Family Services issued emergency regulations strengthening and clarifying the process by which physicians can grant medical exemptions to vaccination requirements. These regulations amended Title 10, Subpart 66-1. A copy of the emergency regulations is attached hereto as Exhibit A.

7. The same emergency regulations were renewed, effective November 14, 2019. After a public comment period, the amendments to these regulations were permanently adopted as of December 31, 2019. The portion of the permanently adopted regulations being challenged in this matter was unchanged from the emergency regulations. A copy of the permanently adopted regulations are attached hereto as Exhibit B.

8. Prior to August 2019, under the unamended version of 10 NYCRR § 66-1.3(c), a school could accept a "signed statement" from a physician, but under the amended and current version 10 NYCRR § 66-1.3(c), the school may only grant medical exemptions when the physician has filled out a one-page medical exemption form approved by the Department or the NYC Department of Education. See id.; see also a copy of the medical

2

exemption form (DOH-5077) attached hereto as Exhibit C.

9. However, the newly required medical exemption form was previously available to physicians for their use and has remained the same since June 2016. This simple, one-page form is not burdensome and only requires the patient's name, date of birth, address, school, and a description of the patient's contraindications/precautions to a specific vaccination, as well as the date the medical exemption ends. Finally, a physician must sign the form and provide their medical license number, address, and telephone number.

10. The regulatory amendments requiring the use of this medical exemption form have not changed the type of information required by the physician. The regulatory amendments did not change the requirement that the document signed by the physician is "certifying that immunization may be detrimental to the child's health, containing sufficient information to identify a medical contraindication to a specific immunization and specifying the length of time the immunization is medically contraindicated." 10 NYCRR § 66-1.3(c); see also Exhibit B.

11. However, the amendment does supply a definition of "may be detrimental to the child's health." 10 NYCRR § 66-1.1(l) provides that a physician must determine "that a child has a medical contraindication or precaution to a specific immunization consistent with [the Advisory Committee on Immunization Practices] guidance or other nationally recognized evidence-based standard of care." 10 NYCRR § 66-1.1(l).

12. The recent regulatory changes conform the regulations with current guidance from the U.S. Centers for Disease Control and Prevention's ("CDC's") Advisory Committee on Immunization Practices ("ACIP"). The CDC maintains immunization schedules and guidelines for when immunization may be detrimental to a child's health due to a medical contraindication or precaution to a specific immunization — a nationally recognized evidence-

3

based standard of care. A copy of the ACIP's Contraindications and Precautions is attached hereto as Exhibit D. According to the CDC website, "[t]he ACIP includes 15 voting members responsible for making vaccine recommendations. The Secretary of the U.S. Department of Health and Human Services . . . selects these members following an application and nomination process." Also, "[i]n addition to the 15 voting members, ACIP includes 8 ex officio members who represent other federal agencies with responsibility for immunization programs in the United States, and 30 non-voting representatives of liaison organizations that bring related immunization expertise." A copy of the CDC's description of the ACIP Committee Members is attached hereto as Exhibit E. The ACIP includes medical and public health experts, including vaccine experts, scientists, doctors and public health professionals, who meet 3 times every year to discuss vaccine recommendations. The CDC's additional description of the ACIP is attached hereto as Exhibit F.

13.     The CDC recommends that "[p]ersons who administer vaccines should screen patients for contraindications and precautions to the vaccine" before administering vaccinations. This screening is "facilitated by consistent use of screening questionnaires, which are available from certain state vaccination programs and other sources (e.g., the Immunization Action Coalition.)." Id. These screening checklists, such as the ones available through the Immunization Action Coalition, ask extensive and comprehensive questions regarding the patients' medical histories to determine whether children have allergies, especially to vaccine components, serious reactions to vaccinations in the past, long-term health problems, family members with health problems, and more. An example of the Immunization Action Coalition's screening checklist is attached hereto as Exhibit G.

14.     The Department's regulatory amendments did not change the pre-existing requirement that the medical exemption must be reissued annually. "Permanent" medical

exemptions were not, and are not, an option. This is because, as indicated by the CDC, "the majority of contraindications are temporary" and vaccines can often be administered when the contraindication no longer exists. For example, known "contraindications" to the MMR vaccination are pregnancy, or a known severe immunodeficiency, such as the receipt of chemotherapy. Both of these are transient contraindications. The same can be said for known "precautions" to a vaccination, or a condition that might increase the risk for a serious adverse reaction. In general, when a precaution is present, vaccinations should only be deferred. For example, according to the CDC, the "presence of a moderate or severe acute illness with or without a fever is a precaution to administration of all vaccines." However, this is only reason to delay, not avoid, the vaccination. See Exhibit D. Since the presence of contraindications or precautions to a vaccination may change over a child's lifetime, the issuance of a "permanent" medical exemption is, appropriately, not an option.

15. These regulatory amendments do not remove a physician's ability to issue a medical exemption, using their expert medical discretion and knowledge of the patient's medical history. These amendments also do not necessarily require doctors to follow only the ACIP guidelines. For example, the Infectious Diseases Society of America ("IDSA") has clinical practice guidelines for vaccination of the immunocompromised host. A copy of this guidance is attached hereto as Exhibit H. The American Academy of Pediatrics ("AAP")[1] and the American Academy of Family Physicians ("AAFP")[2] both publish vaccine recommendations that closely mirror, but sometimes differ from, the ACIP guidelines. The AAP also addresses contraindications and precautions to vaccination in its Red Book; Report of the Committee on

---

[1] https://www.aap.org/en-us/advocacy-and-policy/aap-health-initiatives/immunizations/Pages/vaccine-preventable-diseases-and-policy.aspx (last visited September 1, 2020).
[2] https://www.aafp.org/patient-care/public-health/immunizations.html (last visited September 1, 2020).

5

Infections Diseases.[3] These are examples of, but not necessarily the only nationally-recognized evidence-based standards of care that doctors must follow in issuing medical exemptions.

16. The express language in the previous set of regulations already required that a doctor should be certifying that "immunization may be detrimental to a child's health, containing sufficient information to identify a medical contraindication to a specific immunization." The amendments only changed this requirement to the extent it now requires this certification must be consistent with ACIP guidance or other nationally recognized, evidence-based standards of care. 10 NYCRR § 66-1.1(l). However, the process under the prior standard and the current standard is substantially similar from a physician's standpoint. In other words, under both the prior and new regulatory scheme, physicians should always be following nationally recognized, evidence-based standards of care to make legitimate medical exemption determinations. Physicians cannot practice medicine in a vacuum, and in all fields of practice, must always operate within the parameters of the currently acceptable standard of care. The issuance of medical exemptions should be treated no differently.

17. These amendments will prevent medical exemptions being issued inappropriately by those without legitimate medical reasons for not getting vaccinated, or for those who are just seeking a "replacement" for a previously held, but no longer valid, religious exemption. A copy of the Department's August 16, 2019 Press Release regarding these amendments is attached hereto as Exhibit I.

18. It has come to the Department's attention that invalid medical exemptions have been provided to families who are seeking to avoid school vaccination requirements. For

---

[3] https://redbook.solutions.aap.org/Book.aspx?bookid=2205 (last visited September 1, 2020).

instance, while Public Health Law § 2164 and NYCRR Title 10, Subpart 66-1, provide that it is the responsibility of the principal or person in charge of a school to make determinations on medical exemption requests, schools have the option of requesting that the Bureau of Immunization Medical Director consult on these requests. Through that process, the Department is aware of medical exemptions issued for reasons not supported by ACIP guidelines or other nationally recognized evidence-based standards of care.

19.   For example, the Department is aware of cases of apparent falsification of medical records. Additionally, the Department has learned of incidents of parents intentionally misleading physicians by bringing in children who are not their own so that a blood test for immunity can be drawn in another child's name. A copy of the Department's Notification to Providers Regarding Medical Exemptions is attached hereto as Exhibit J.

20.   These amendments will also prevent medical exemptions from being issued inappropriately to children with conditions that are commonly misperceived as a valid contraindications or precautions, which "result in missed opportunities to administer recommended vaccines." See Exhibit D.  Sometimes, adverse reactions to previous doses of vaccinations might be misconstrued as a "severe adverse reaction" or a "vaccination injury". However, these might be normal reactions to the vaccination and do not constitute "contraindications" or "precautions." For example, the presence of a fever, collapse, inconsolable crying, and even seizures after vaccination of a previous dose of DTP or DTaP are known reactions to the vaccine, and are not a valid contraindications or precautions to future doses of the vaccination. In the context of the DTaP vaccination, the same is true of those with known family history of adverse events or even those with stable neurological conditions, such as developmental delays or well-controlled seizures. These do not rise to the level of known "contraindications" or "precautions."   See Exhibit D.

21. Finally, the amendments to Title 10, Subpart 66-1 did not change the longstanding, pre-existing requirement that a child receive vaccinations according to the ACIP Recommended Child and Adolescent Immunization Schedule. To the extent that the Plaintiffs in the instant matter challenge the general safety of the ACIP Immunization Schedule, or recommended catch-up schedule, the Department advises that following the recommended schedule is essential because it provides children with immunity from potentially serious diseases before they come into contact with them.

22. The Department defers to the CDC guidance on this issue, which states that the immunization schedule is designed "based on how your child's immune system responds to vaccines at various ages, and how likely your baby is to be exposed to a particular disease." A copy of the CDC's Guidance on following the recommended immunization schedule is attached hereto as Exhibit K. The Immunization Action Coalition similarly defers to the ACIP recommendations, stating that "[a]s a general rule, infants or children who are more than 1 month or 1 dose behind schedule should be on an accelerated schedule, which means the intervals between doses should be reduced to the minimum allowable." A copy of the Immunization Action Coalition's Guidance on Scheduling Vaccines is attached hereto as Exhibit L. The United States' long-standing vaccine safety system ensures vaccines are as safe as possible and the national vaccine recommendations are modified as appropriate when new vaccine effectiveness or safety data becomes available. The CDC's Infant Immunization Frequently Asked Questions is attached hereto as Exhibit M.

23. The Department has and continues to require follow-up doses of vaccinations in accordance with the ACIP schedule. The recent regulatory amendments do not change this requirement. Children who are not fully immunized can continue to attend school if they are "in process" of completing the immunization series, as defined §66-1.1(j).

This regulatory provision is still consistent with the ACIP schedule.

24. However, if a child is not immunized in accordance with Public Health Law § 2164 and its implementing regulations, the consequences of this are not forcible vaccination in disregard of a parent's wishes, but exclusion from school. Each parent still retains the choice to withhold consent to vaccinate their children in accordance with this provision.

## MEASLES OUTBREAK IN NEW YORK STATE

25. The regulatory amendment to Title 10, Subpart 66-1 is part of the Department's multifaceted approach to address the 2018-2019 measles outbreaks in multiple counties throughout New York State.

26. The United States experienced the worst outbreak of measles in more than 25 years in 2018 and 2019, with outbreaks in pockets of New York primarily driving the crisis ("October 2018 outbreak"). Measles was declared eliminated from the United States in 2000 after the development and widespread use of the MMR vaccination. However, according to the CDC data, in 2018 there were 375 confirmed measles cases in the United States, growing to 1,282 individual cases of measles in 2019. This was the highest number of cases in the United States since 1992. A copy of the CDC data is attached hereto as Exhibit N. From 2008-2017, there were about 0-7 cases of measles per year in New York State outside of the New York City area, followed by a very marked and rapid increase in cases in 2018 and 2019 associated with the October 2018 measles outbreak.

27. According to the CDC, more than 73 percent of the cases of measles in the United States in 2019 were linked to outbreaks in New York State and New York City. While these outbreaks were initially caused by travelers who brought measles back from other countries, the number of confirmed cases continued to spread across New York State, with the majority of cases occurring in communities with pockets of unvaccinated individuals. See id.

9

28. The Department conducts annual surveys of schools and child day care settings in order to determine and verify vaccination rates. Additionally, the Department audits a sample of schools each year to verify the rates reported in the survey. Statistics show that as a result of non-medical vaccination exemptions, many communities across New York have low rates of vaccination, and some of those communities had the highest rates of measles in the New York State October 2018 measles outbreak.

29. From October 1, 2018 to November 16, 2019, there were 426 confirmed measles cases in New York State, excluding New York City. A copy of the Department's data is attached hereto as Exhibit O. In New York City, there were an additional 649 cases confirmed from between September 2018 and August 2019, bringing the total count in New York State to approximately 1,075 cases. A copy of the New York City Department of Health and Mental Hygiene's data is attached hereto as Exhibit P.

30. 75.6 percent of the confirmed measles cases in the New York State October 2018 measles outbreak outside of the New York City region were children[4] (including those who attend daycare and pre-school), and 92 percent of the children with confirmed measles had no or unknown MMR vaccination status.

31. Measles is one of the most contagious diseases known to humankind. Vaccination is so vitally important to controlling outbreaks of measles because individuals are highly contagious before they acquire the characteristic rash (approximately 2 days after the initial symptoms begin). Therefore, no strategy that includes isolation or quarantine *only* will effectively work to prevent transmission.

---

[4] For the purposes of this affidavit, "children" is defined at 6 months to 17 years.

10

32. Measles is a viral disease transmitted via the airborne route when an infected person coughs or sneezes. It is one of the most contagious diseases known. Following exposure to the virus about 90 percent of people who are susceptible will develop measles. Measles virus can remain active and contagious for up to two hours in the air or on surfaces. People can contract measles by walking into a room where an individual infected with measles has been, being in an elevator after someone with measles has been there, or being next to a person who sneezes or coughs.

33. Measles is characterized by a period of fever (101–105 degrees F) followed by cough, coryza, and/or conjunctivitis. A red rash that is both flat and raised presents 2-4 days later and lasts 5-6 days. It usually starts on the face and proceeds down the body to involve the extremities last and may include the palms and soles. The rash is usually discrete but may become confluent on the upper body; it resolves in the same order that it appeared. Koplik's spots (punctate blue-white spots on the bright red background of the buccal mucosa) may be present, often before the rash develops, but are often not seen and are not required for the diagnosis of measles. Those who are infected can spread measles to others from four days before through four days after this rash appears.

34. Measles is a very serious disease. This is especially true for children less than five years of age and adults who are over twenty years of age. Common complications include ear infection, which can result in permanent hearing loss, and diarrhea. Severe complications include pneumonia and encephalitis. About one child out of one thousand will get encephalitis, which can result in seizures, deafness or permanent disability. Approximately one in twenty children with measles gets pneumonia, which is the most common cause of death from measles in children. For every one thousand cases of measles, one or two

children will die, despite the best medical care. Measles can also cause premature birth in pregnant women, as well as miscarriage and low birth weight for infants.

35. The measles vaccine is very effective and remains the best protection against the disease. One dose of measles vaccine is about 93 percent effective at preventing the measles if exposed to the virus. Two doses are about 97 percent effective. About 3 percent of people who have received two doses of the measles, mumps and rubella vaccine (MMR) vaccine are still at risk of getting the measles if exposed to the virus. The chances of a fully vaccinated person getting measles is more likely during an outbreak where they have close and prolonged contact with someone with measles. Additionally, fully vaccinated people who get the measles are much more likely to have a milder illness.

36. Fully vaccinated individuals are also less likely to spread measles to other people, including people who cannot get vaccinated because they are too young, or they have a weakened immune system. Those opposed to vaccination frequently argue that those who have received vaccines made from live viruses are contagious because they can "shed" the virus. While shedding of a live virus obtained from vaccination is theoretically possible, the risk of transmission is minimal, given that the live virus in a vaccination is a changed and weakened version of the actual virus. There have been no confirmed cases of an individual transmitting the vaccine strain of measles to another person.

37. The measles vaccine is extremely safe and serious side effects are rare. Fever is the most common side effect of the MMR vaccine. About one in ten people will get a fever about a week to a week and a half after vaccination. The fever usually lasts for a day or two and then gets better on its own. About one in twenty people will develop a red rash about a week to a week and a half after MMR or MMRV vaccine. The rash may look like measles

but usually is much milder. There has never been a documented case of a vaccinated person spreading measles as a result of receiving the MMR vaccine.

38.  Severe reactions rarely occur after the MMR vaccine. For example, about four in every ten thousand children (0.04%) who are vaccinated with MMR vaccine will experience a febrile seizure (a seizure caused by a fever) within 5-12 days after vaccination. Febrile seizures can happen with any condition that causes a fever, including measles, mumps or rubella infection. By comparison, seizures occur in about six to seven in every one thousand (0.6% - 0.7%) cases of measles. The risk of seizure from measles is more than ten-fold higher than the risk of seizure from the MMR vaccine.

### **NEW YORK STATE'S COMPREHENSIVE RESPONSE TO THE OUTBREAKS**

39.  In response to the measles outbreaks, the Department aggressively worked with the local counties to investigate and address each measles case as it arose. A concerted public health effort was required to address the occurrence of every case of measles in a community, even if there was only one singular case. Each case was investigated, and lab confirmed at the New York State Public Health Laboratory whenever possible. Contacts of each case were identified, and their immune status was determined. Those who could get post exposure preventive treatments were offered either vaccination or immune globulin, as indicated. Those who were not immune and not eligible for treatment were isolated and monitored for the development of disease. Cases that develop in siblings of a confirmed case who live in the same household and who develop disease may not be tested because they have a known exposure to a confirmed case and are considered confirmed themselves.

40.  Additionally, as part of the multi-faceted approach to addressing this public health emergency, on June 13, 2019, New York State signed into law legislation which

13

removed religious exemptions from school vaccination requirements for children in prekindergarten-12th grade ("religious exemption repeal"). (Laws of 2019, Chapter 35, which, among other things, repealed former NYS Public Health Law § 2164(9)). The law now treats individuals with religious beliefs contrary to immunization exactly the same as individuals with non-religious beliefs contrary to immunization.

41. The purpose of the religious exemption repeal is to increase the number of children immunized against vaccine-preventable diseases, such as measles, in order to prevent outbreaks. "Herd immunity," the concept that if enough people are vaccinated in a community the entire community is less likely to get a vaccine-preventable disease, reduces the likelihood that an individual will be exposed to a vaccine-preventable disease. Accordingly, the Department recommends that all schools aim for at least ninety-five percent vaccination coverage in order to optimize protection against vaccine preventable diseases. Herd immunity has historically been considered to be achieved (or virtually achieved) when, at a minimum, ninety-five percent of the population in a community is immunized.

42. Herd immunity helps to protect people in a community who might be too young to be vaccinated themselves or cannot be vaccinated due to legitimate medical reasons. However, it does not reduce that risk of getting a vaccine-preventable disease to zero, nor does it provide direct protection in the same way that vaccination does.

43. The regulatory amendments to Title 10, Subpart 66-1 conform existing regulations with the Public Health Law § 2164, as enacted by the Legislature, by eliminating references to non-medical exemptions to vaccination requirements (see Chapter 35 of the Laws of 2019). During the public comment prior to permanent adoption, these amendments were supported by the New York State American Academy of Pediatrics, New York State Academy of Family Physicians, New York State Association of County Health Officials,

14

American Nurses' Association, Medical Society of the State of New York, and the New York State Society of Dermatology and Dermatologic Surgery. See Exhibit B.

44. Chapter 35 of the Laws of 2019 eliminated non-medical (i.e. religious) exemptions to vaccination requirements to address the unacceptable low rates of vaccinations across New York State communities, as a result of non-medical vaccination exemptions. Again, some of those communities had the highest rates of measles in the October 2018 measles outbreak. By additionally amending Title 10, Subpart 66-1 to strengthen and clarify the remaining medical exemption requirements, the Department is ensuring that the regulations conform with the intent of the recent religious exemption repeal. By ensuring that medical exemptions are only given to those with legitimate medical contraindications or precautions, future outbreaks will be prevented by safeguarding that communities build and maintain high vaccination rates, i.e. strengthening herd immunity.

45. As demonstrated by a similar situation in California in 2015, removing non-medical exemptions to school immunization requirements alone, without taking steps to strengthen medical exemptions, can result in the explosion in the use of medical exemptions. In 2015, after California removed non-medical exemptions, over the next three years the use of medical exemptions more than tripled. By strengthening medical exemption requirements, and providing clear evidence-based guidance to physicians, this will prevent medical exemptions being issued for non-medical reasons. See id.

46. Both the religious exemption repeal and the recent regulatory amendments clarifying and strengthening the medical exemption requirements will protect the public, including children, from several forms of communicable disease.

47. Due to the concerted and comprehensive efforts of the Department to address the measles outbreaks, on October 3, 2019, the Department announced that it had

15

been more than two incubation periods (42 days) since any new cases of measles from the initial measles outbreak that started in October 2018. However, the threat of widespread or severe injury or loss of life is still very real not just for measles, but for all vaccine-preventable diseases. A copy of the Department's October 3, 2019 Press Release regarding the Public Health Response to Measles is attached hereto as Exhibit Q.

    48. Measles is not the only serious preventable disease that is of concern. The CDC declared vaccination to be one of the ten greatest public health achievements of the twentieth century. The introduction and widespread use of vaccines have profoundly reduced the occurrence of many serious infectious diseases. Prior to vaccines, thousands of children each year, living in the United States, could expect to die or be left with life-long disabilities as a result of contracting diseases that are now preventable by vaccination, such as smallpox, poliomyelitis, rubella, measles, diphtheria and pertussis. If enough people stop getting vaccinated, outbreaks of now-rare, preventable diseases could continue to return, as it did with measles.

    49. Rubella and polio have both been declared eliminated from the United States, however they are both occurring in other countries and therefore, unvaccinated New Yorkers remain at risk of those diseases if they either travel to those countries or have contact with people sick with rubella or polio visiting from or returning from travel to countries in which they are circulating.

    50. The worldwide eradication of smallpox and the near-eradication of poliomyelitis can be directly attributed to vaccination. Similarly, once commonly encountered and often deadly diseases such as diphtheria and rubella are becoming a rarity in the United States as a result of the routine use of vaccination against these and other infectious diseases. Many of these now vaccine-preventable diseases, due to their person-to-person

mode of transmission, have historically occurred at very high rates in pre-school and school-aged children. Consequently, it is of the utmost importance, that this cohort maintains a high rate of vaccination coverage to prevent disease outbreaks. Studies have in fact shown that when parents comply with school entry laws, corresponding disease in the community decreases proportionally.

51. Given the recent world-wide outbreak of COVID-19, a respiratory disease caused by a novel coronavirus that spreads from person to person, it is more important than ever to prevent concurrent outbreaks of communicable diseases.

52. Since the first confirmed case of COVID-19 in the United States on January 22, 2020, the disease has spread with devastating speed to each of the 50 states. As of August 31, 2020, there have been 5,972,356 confirmed cases and 182,622 deaths in the United States. Relevant website information is attached hereto as Exhibit R. New York has been hit particularly hard by the COVID-19 pandemic, with 435,510 confirmed cases and 25,331 fatalities as of September 1, 2020. The relevant website information is attached hereto as Exhibit S and Exhibit T, respectively.

53. Per Executive Order 202.4, all schools in New York State were directed to close no later than March 18, 2020 as a result of the COVID-19 outbreak, with school districts establishing plans for alternative instructional options, such as remote learning opportunities, to allow children to continue to learn from home. Executive Order 202.4 is attached hereto as Exhibit U and the New York State Education Department's letter to school districts is attached hereto as Exhibit V.

54. Schools have been given the green light to reopen for the 2020-21 school year, with the New York State Education Department issuing a guidance document to guide schools and school districts in their reopening plans, whether instruction takes place in person,

17

remotely, or some combination of the two. A copy of the Reopening Guidance is attached hereto as Exhibit W.

55. Whether children will be attending school in person or utilizing remote instruction opportunities (or a combination of both), the immunization mandates of PHL § 2164 still apply to all children attending or admitted in such school.

56. 10 NYCRR § 66-1.3 states that a "principal or person in charge of a school shall not admit a child to school unless a person in parental relation to the child has furnished the school with" with either a certificate of immunization, documentation that the child is in process of receiving immunizations, or a medical exemption form. (emphasis added). 10 NYCRR § 66-1.4 state that a "principal or person in charge of a school shall not permit a child to continue to attend such a school for more than 14 days unless a person in parental relation to the child has furnished the school" with either a certificate of immunization, documentation that the child is in process of receiving immunizations, or a medical exemption form. (emphasis added). For the purposes of these regulations, "attend" or "admit" means "enrolled in, or admitted to, a school for the purposes of participating in or receiving services at such school, including but not limited to special education or related services, participating in intra-scholastic or interscholastic sports, or other school sponsored events or activities; or being transported on a school bus or vehicle with other school children." For those children utilizing remote learning opportunities, they are still considered "attending" or "admitted" to school.

57. It would be incredibly risky and potentially catastrophic if NYS allowed a widespread vaccination failure by parents who choose remote learning for their children during this global pandemic. There is currently no vaccination for COVID-19. At the height of this pandemic, New York's health care system was spread thin, with beds, and ventilators in short

supply, a situation that New York City doctors have described as apocalyptic. Doctors, nurses, and other facility employees working on the front lines were not spared from the virus.

58. When immunization coverage rates drop, even in only localized or isolated communities, the risk of vaccine preventable disease outbreaks rises, as we saw in the 2018-2019 measles outbreak, which resulted in a large number of cases spreading quickly in relatively small communities that had very low rates of MMR vaccination coverage (within a state that had a high overall MMR vaccine coverage). The vaccination mandates are in place not only to protect children in close proximity in a classroom, but more importantly, the public at large. Even if parents choose to pursue remote learning opportunities, there still remains a risk to the public if unimmunized children in the community begin to grow in number. If immunization rates for vaccine-preventable diseases begin to drop, New York State could face the precarious scenario of dealing with multiple outbreaks of communicable diseases at the same time. To risk another measles outbreak, or outbreaks of other vaccine-preventable disease, during a time when New York State's public health resources are already incredibly strained, would be extremely irresponsible.

59. During this public health emergency, our medical and public health infrastructure simply cannot withstand simultaneous COVID-19 and measles (or other vaccine-preventable diseases) outbreaks, particularly considering the ever-increasing likelihood that New York State will experience an annual influenza epidemic this winter.

60. Even after this public health emergency passes, it is unclear what role, if any, remote learning might play in our children's future. Given the potential for remote learning opportunities to become more common-place in the future, it is important to ensure that herd immunity is maintained and that parents who choose distance-learning aren't doing so inappropriately, merely to avoid vaccination requirements. There is nothing to indicate that the

legislature, in repealing the religious exemption to vaccination mandates, contemplated that another exception to vaccination requirements should or would be created in its place.

_____
ELIZABETH RAUSCH-PHUNG, MD, MPH

Dated: Albany, New York
      September 4, 2020