# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JANE DOE, et al. | Civil Action No.: 1:20 – CV – 0840 (BKS/CFH) |
| Plaintiffs, | |
| vs. | **MEMORANDUM OF LAW** |
| HOWARD ZUCKER, et al. | |
| Defendants. | |

## PLAINTIFFS' REPLY IN SUPPORT OF PRELIMINARY INJUNCTION

Sujata S. Gibson, Esq.
**The Gibson Law Firm, PLLC**
*Attorneys for the Plaintiffs*
407 N. Cayuga Street, Suite 201
Ithaca, NY 14850
Tel: (607) 327-4125
Email: sujata@gibsonfirm.law
Bar Roll No. 517834

Michael Sussman, Esq.
**Sussman & Associates**
1 Railroad Ave, Suite 3, PO Box 1005
Goshen, NY 10924
Bar Roll No. 123324

Robert F. Kennedy Jr., Esq., *Of Counsel*
Mary Holland, Esq., *Of Counsel*

September 9, 2020

1

# TABLE OF CONTENTS

Table of Contents ........................................................................................................ 2

Table of Authorities ................................................................................................... 3

Preliminary Statement ............................................................................................... 5

Statement of Facts ..................................................................................................... 7

Legal Argument ....................................................................................................... 12

**I.      Plaintiffs require a preliminary injunction to avoid ongoing irreparable
         harm** ....................................................................................................... 12

**II.     Plaintiffs have a high likelihood of success on the merits** ............................. 12
         **a.   Medical Exemption Cases Do Not Receive Special Deference**
         **b.   Defendants' reliance on religious exemption cases is misplaced**
         **c.   The burdens on plaintiffs in this case are unconstitutional under any
               standard of review**

CONCLUSION ......................................................................................................... 24

1

## TABLE OF AUTHORITIES

2

<u>**Cases**</u>

3

*Adams & Boyle, P.C. v. Slatery*,

4
　　956 F.3d 913 (6th Cir. 2020) ...................................................................... 15, 18

5
*Brown v. Board of Education*,

6
　　347 U.S. 483 (1954) ............................................................................................ 12

7
*Caviezel,*

8
　　701 F.Supp.2d at 426 847 F. Supp. 1070 (W.D.N.Y. 1994) ............................. 12

9
*Faiveley Transp. Malmo AB v. Wabtec Corp.*,
　　559 F.3d 110, 118 (2d Cir. 2009) ...................................................................... 11

10
*Jacobson v. Massachusetts*,

11
　　197 U.S. 11 (1905) ..................................................... 5, 6, 14, 15, 16, 17, 22

12
*Lewis v. Sobol,*

13
　　710 F.Supp. 506, 507 (S.D.N.Y.1989) 453 Mass. 179 (2009) ......................... 12

14
*New York ex rel. Schneiderman v. Actavis PLC*,

15
　　787 F.3d 638, 660 (2d Cir. 2015) ...................................................................... 12

16
*Parham v. J.R.*,
　　442 U.S. 584 (1979) ............................................................................................ 19

17

18
*Phillips v. City of New York*,
　　775 F.3d 538 (2d Cir. 2015) ............................................................................... 17

19
*Planned Parenthood of Southeastern Pa. v. Casey,* 505 U.S. 833 (1992)

20
　　505 U.S. 833 (1992) ............................................................................................ 21

21
*Robinson v. Attorney General* 957 F.3d 1171 (11th Cir. 2020)

22
　　375 F. Supp. 3d 280 (E.D.N.Y. 2019) .............................................................. 22

23
*Steinberg v. Carhart*,

24
　　530 U.S. 914 (2000) ........................................................................................ 5, 21

25
*Troxel v. Granville*,

26
　　530 U.S. 57 (2000) .............................................................................................. 19

27
*V.D. v. State,*
　　403 F.Supp 3d 76 (E.D.N.Y 2019)521 U.S. 702 (1997) ............................. 13, 14

28

*V.W. by and through Williams v. Conway,*
      236 F. Supp. 3d 554 (N.D.N.Y. 2017) ............................................................. 13

**<u>Statutes</u>**

N.Y. P.H.L. §2164[8] ..................................................................................... 6, 14

**<u>Federal Rules of Civil Procedure</u>**

Fed. R. Civ. P. 65 ............................................................................................ 1

**<u>Other Authorities</u>**

LAWRENCE 0. GOSTIN, PUBLIC HEALTH LAW: POWER, DUTY, RESTRAINT 126-28
(2d ed.2008) .................................................................................................. 17

## **PRELIMINARY STATEMENT**

Plaintiffs hereby reply is support of their motion for a preliminary injunction and respectfully request an evidentiary hearing.

Plaintiffs need an injunction to prevent the defendants from continuing to violate their constitutional rights by imposing arbitrary and undue burdens on their ability to secure a medical exemption for their medically fragile children. Hundreds of medically fragile children have been removed from school as a result of new policies that take discretion away from treating physicians, and removal is imminent for many more. The children and their families are suffering devastating irreparable and ongoing harm, and thus appeal to the Court to intervene. *See* DKTS 41-3 through 41-38 (declarations from some of the impacted families).

The challenged policies are arbitrary, capricious, and unjustified to further any legitimate purpose. Defendants admit that the goal of the new policies and procedures is to burden the medical exemption process so that fewer children can obtain one. To that end, they have arbitrarily narrowed the definition of "what may cause harm" such that only a fraction of the known serious adverse reactions can now be considered. They have vested school principals with the authority to overrule the children's treating medical providers. And they have harmed hundreds of children irreparably.

Limiting the number of children who obtain a medical exemption at the expense of the health and well-being of medically fragile children is not a constitutional purpose. Defendants offer no permissible justification for subjecting these families to such harm. They concede that the less than 0.2% of children who seek a medical exemption cannot jeopardize necessary herd immunity numbers. And yet, rather than consider any reasonable accommodation, defendants announced last month that they will not even allow these children to participate in the remote

online learning programs that all schools have made available this year. Defendants offer no credible justification for such hostility towards the medically fragile. Their policies and the discussions around them are arbitrary, inflexible and reveal evidence of animus.

The challenged policies will not likely withstand judicial review. A sufficient medical exemption has been recognized as a constitutional prerequisite to any vaccine mandate for a hundred and fifteen years. *Jacobson v. Commonwealth of Massachusetts*, 197 U.S. 11 (1905). Controlling precedent from the Supreme Court expressly dictates that medical exemption policies cannot require unanimity of medical opinion but must proceed deferentially. *Stenberg v. Carhart,* 530 U.S. 914, 937 (2000)(finding a ban on partial birth abortions required a medical exemption that allowed for differences of medical opinion about necessity).

Rather than address the clear constitutional issues triggered by the allegations in this case, Defendants engage in classic strawman tactics. Their central argument is that plaintiffs cannot prevail because the Supreme Court already decided that vaccine mandates are allowed in *Jacobson v. Commonwealth of Massachusetts*, 197 U.S. 11 (1905). That is not the issue before the Court.

Plaintiffs do not challenge *Jacobson* or its holding that the police power of the state are broad enough to include vaccine mandates within certain limits. On the contrary, plaintiffs rely on *Jacobson,* which expressly held that a sufficient medical exemption is a necessary constitutional prerequisite to the state's police power, which in any event deserves a high level of scrutiny from courts.

Defendants further fail to address the serious irreparable harms suffered by plaintiffs or assert evidence of sufficient necessity for their draconian measures, arguing that *Jacobson* gives them carte blanche authority to operate without any scrutiny if vaccines are involved.

In addition to fundamentally misconstruing the issues before the Court, defendant's cite to inapposite cases which do not extend state authority or judicial discretion nearly as far as defendants assert. The factual submissions are contradictory and raise a number of questions.

Plaintiffs respectfully request an evidentiary hearing to clarify the underlying facts of this case.

Plaintiffs have a high likelihood of success on the merits and need a preliminary injunction to avoid further irreparable harm pending the outcome of litigation.

## STATEMENT OF FACTS

For over half a century, New York's existing public health law has amply met the public health needs of the state. NY PHL §2164[8]:"*If any physician licensed to practice medicine in this state certifies that such immunization may be detrimental to a child's health, the requirements of this section shall be inapplicable until such immunization is found no longer to be detrimental to the child's health.*"

The problems arise from defendants' adoption of additional policies and practices which, per defendants' own admissions, intentionally limit the availability of medical exemptions beyond what the statute allows, even for children who may be at risk of serious harm from vaccines.

First, defendants arbitrarily narrowed the allowable reasons to obtain a medical exemption. New regulations remove the determination of "what may cause harm" from the treating physicians and substitute a narrow set of circumstances, pre-defined by the CDC's "ACIP guidelines," which are now the only reasons defendants will accept for medical exemptions.

Clinical guidelines, such as the ACIP guidelines, are meant only to serve as a guide to treating physicians in making clinical decisions. The CDC has acknowledged in writing that the ACIP guidelines are not an exhaustive list and cannot serve as a substitute for physicians' clinical judgment. Nor can the guidelines form the basis for a "valid medical exemption."

NYSDOH defendants do not refute that the ACIP guidelines are not comprehensive or that it is irrational to use guidelines as an exhaustive list of permissible contraindications. Instead, they allege that their regulations are reasonable because they include the alternative possibility of basing a medical decision on "*other nationally recognized evidence-based standards of care.*" This argument is refuted by the defendants' own documentary submissions.

An evidentiary hearing will show that in practice, the defendants routinely only consider the ACIP guidelines in their reviews and do not even pay lip service to other standards of care. The NYSDOH guidelines for implementation of the new regulations only mention ACIP, as do most of the letters recommending denial from Defendant Elizabeth Rausch-Phung to individual school districts. Several of the school district doctors submitted declarations that concede they only consider ACIP. Arguments from families who have hired lawyers to help the NYSDOH or individual districts understand how the exemption falls within "nationally recognized evidence-based standards" fall on deaf ears.

Second, the new regulations give school principals the power to overrule treating physicians. While the defendants make various conflicting attempts to obfuscate this in their answering papers, they do not credibly deny it. The plain language of the statute provides that "principals or other persons in charge of a school" have the right to overrule treating doctors. NYSDOH defendants' letters to districts affirm this. *See, e.g.,* Dkt. No. 57-2 (Letter from

Defendant Rausch-Phung to Lansing School recommending denial of medical exemption):

> Lastly, it should be noted that in making a determination on a medical exemption request, the school should seek the appropriate medical consultation (e.g., the school's medical director). The school may also request, as it has here, a recommendation from the New York State Department of Health (NYSDOH).  However, after the appropriate consultation has occurred, "the principal or person in charge of a school" is responsible for making the final determination.

Yet defendants each acknowledge that school principals are not qualified to make medical exemption determinations.

It does not cure the problem for principals to consult with a medical professional before making a final determination. School principals are no better qualified to decide between competing medical opinions than they are to second guess the treating physician in the first place.

School district defendants allege that they are scared they will be fined "$2,000 a day per unvaccinated child" if they allow a child to remain in school whose medical exemption is later overruled. Thus, they are motivated to overrule treating physicians whenever a difference of opinion arises.

Plaintiffs, by contrast, contend that such policies pose enormous risks to their medically fragile children. The consulting doctors have no duty of care to the child, are often given financial incentives to deny as many exemptions as possible, have never examined the child, and do not have the full medical record or understand the plethora of factors required to assess the individual child. It is not reasonable or even possible for a treating physician to document all the factors that go into his or her recommendation. A stranger to the child cannot reliably understand the full circumstances necessary to make an informed medical judgment to accept or deny the exemption.

Defendants concede that these and other challenged policies and practices are meant to burden the medical exemption so that the number of students who have access to the exemption dwindles.

Defendants have not submitted evidence or serious argument that these goals serve any legitimate purpose. Defendants do not allege that there is widespread abuse of the medical exemption program, or even submit evidence that children with a medical exemption pose any threat to their classmates.

Defendants stress that a measles outbreak in 2019 caused over 1,000 cases of measles in New York in 2019.  Yet defendants do not suggest that medical exemption policy played any part in this outbreak.

Defendants do not mention that there have been no confirmed measles deaths in New York for over a decade and that all of the people who contracted in 2019 recovered fully. The only confirmed measles death in the US in the last decade occurred in a fully vaccinated, extremely immune-compromised adult woman who is believed to have been infected by a fully vaccinated 57-year-old man in the hospital.

Defendants concede that the number of children who seek medical exemptions is far too low to impact herd immunity, which requires 85-95% compliance for the vaccines that can affect community immunity. This is particularly true now that no non-medical exemption exists.

Defendants do not refute that several of the vaccines required for school admission cannot protect anyone except the recipient. Tetanus, for example, is not a communicable disease. It is not a matter of controversy that the "IPV" polio vaccine mandated in this country provides personal protection only and cannot stop replication and transmission of disease to protect the general community. The previously favored live polio vaccine (OPV) could provide protection

to others, but it was discontinued because too many children were getting polio from the vaccine and sometimes even passing it on to others. Vaccines mandated for pertussis, diphtheria and meningitis fall into the same category as the IPV vaccines. They can provide personal protection from symptoms but cannot stop a child from catching the disease and passing it on to others. *See* Dkt 41-3 par. 10-12; Dkt 41-7 and Dkt 41-8.

The Covid-19 pandemic resulted in the closure of all New York schools in March 2019. For the upcoming school year, all public schools are offering an option of an entirely online school program. Some schools have announced they will be offering as an additional option a hybrid program which will provide an opportunity for some in-person activities for those families who choose to participate. For any in-person instruction, the regulations require the schools to employ rigorous protective measures, including: strictly limited occupancy and distancing guidelines; rules to ensure that students stay six feet apart; mask wearing; submission to daily temperature checks; staying home in case of any sign of illness or exposure to illness; and robust policies to ensure that surfaces are sanitized every hour and ventilation systems are designed to kill viruses.

Under these circumstances, it is virtually impossible that the miniscule number of school children avoiding one or more vaccines on the advice of their treating physicians would contract a vaccine preventable disease in such an environment or be able to pass it on.

Plaintiffs hope to be able to return to school pending the outcome of this litigation. Defendants refuse to agree to this condition. Instead, with apparent punitive intent, defendants have announced that children whose medical exemptions have been denied cannot participate in school remotely through the 100% online learning options nor participate in any activity limited

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

to "admitted" students, such as taking the Regents exam, an SAT prep course, or graduating with their class. These punitive measures place irrational and dangerous compliance above education.

## LEGAL ARGUMENT

All parties agree that this motion turns on the likelihood of success on the merits and plaintiffs' ability to establish that without temporary relief, they will be irreparably harmed. Both factors strongly counsel in favor of issuing injunctive relief.

## I.     PLAINTIFFS REQUIRE A PRELIMINARY INJUNCTION TO AVOID ONGOING IRREPARABLE HARM

Plaintiffs and defendants agree that a showing of irreparable harm is "the single most important prerequisite for the issuance of a preliminary injunction." *Faiveley Transp. Malmo AB v. Wabtec Corp*., 559 F.3d 110, 118 (2d Cir. 2009) (quoting *Rodriguez v. DeBuono*, 175 F.3d 227, 234 (2d Cir. 1999)). "Irreparable harm is 'injury that is neither remote nor speculative, but actual and imminent and that cannot be remedied by an award of monetary damages.'" *New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 660 (2d Cir. 2015) (quoting *Forest City Daly Hous., Inc. v. Town of North Hempstead*, 175 F.3d 144, 153 (2d Cir. 1999)).

There is no question that the plaintiffs are suffering irreparable ongoing harm sufficient to meet this prong. Defendants are currently depriving *hundreds* of children of the right to pursue an education in any public or private school or daycare. The latest directives even deprive students of the right to participate in fully online education that all public schools now offer.

In *Brown v. Board of Education*, the Supreme Court held that the right to an education is so fundamental to a child's well-being that "in these days, it is doubtful that any child may reasonably be expected to succeed in life if he is denied the opportunity of an education." *Brown v. Board of Education,* 347 U.S. 483, 493 (1954). Whether or not a child is "entitled" to a public

12

education under federal law, there is no argument that *Brown* means that a child deprived of education is irreparably harmed.

Federal courts in New York routinely afford a presumption of irreparable harm where a child has been excluded from school, even temporarily. *See, e.g., Lewis v. Sobol,* 710 F.Supp. 506, 507 (S.D.N.Y.1989) ("it was clear that [plaintiff's daughter] would suffer irreparable harm if barred from attending school"); *see also Caviezel,* 701 F.Supp.2d at 426 ("[The Court] is satisfied that there would be irreparable harm to this child entering school after [the start of the school year].").

Defendants claim that because some of the children's parents submitted letters of intent to homeschool under duress, the children are not deprived of an education. This is belied by the defendants' own documentary evidence and the dozens of declarations submitted in this case. These parents are not "choosing" to homeschool. Rather, after their children were forcibly removed from school, or threatened with imminent removal such that the children's mental health deteriorated, the parents had no choice but to "choose" homeschooling. If parents refuse to sign letters of intent, such as plaintiff Jane Koe chose to do in protest, school officials embroil them in Child Protective Services investigations. In New York, education is compulsory.

Defendants cite *V.D. v. State,* 403 F.Supp 3d 76 (E.D.N.Y 2019), for the proposition that deprivation of an education is not an irreparable harm for purposes of a preliminary injunction. *See* Dkt. No. 61-24 (Defendant's Memorandum of Law), at 23. This is <u>not</u> the Court's holding. Rather, the Court in *V.D.* denied the injunction on the issue of likelihood of success on the merits and did not address the question of irreparable harm at all, presumably because the law is so well settled on this issue.

13

Defendants further argue that because some plaintiffs have been excluded from school since last fall, and only a subset filed lawsuits or appeals in the interim, the court should infer that none are suffering real harm. This inference does not follow in a multi-plaintiff class action suit challenging ongoing unconstitutional practices, as this case does. *See, e.g., V.W. by and through Williams v. Conway,* 236 F. Supp. 3d 554 (N.D.N.Y. 2017)(showing irreparable harm to juvenile inmates where longstanding policies allowed routine impositions of solitary confinement, leading to deprivation of minimum educational instruction, and thus irreparably harming adolescent development).

## II.   PLAINTIFFS HAVE A HIGH LIKELIHOOD OF SUCCESS ON THE MERITS

### a.   Medical Exemption Cases Do Not Receive Special Deference

Unlike religious exemptions to vaccines, there is little debate about the constitutional need for robust medical exemptions in any vaccine mandate.

The *V.D.* case, which defendants misinterpret as supporting their position on irreparable harm, does not implicate medical exemptions. That case only implicates the religious exemption. The Court acknowledged the difference:

> Plaintiffs do not allege that their children are unable to receive vaccinations as a result of their disabilities; indeed, if they did, they would likely qualify for medical exemptions under § 2164(8). Instead, plaintiffs have made the affirmative choice not to vaccinate their children for non-medical reasons, thus opting out of public, private, and parochial schools in New York state. As the defendants acknowledge, plaintiffs are "well within their right to do so," Defs.' Opp'n 21, but the law does not entitle them to a religious exemption to a generally applicable health and welfare law.

*V.D. v. State*, 403 F. Supp. 3d 76, 88 (E.D.N.Y. 2019).

Much of parties' disagreement about the level of scrutiny that required turns on this important distinction. Defendants' argument that strict scrutiny should be abandoned considering

14

*Jacobson's* articulation of deference towards public health decisions in the religious context is inapposite in cases examining the sufficiency of medical exemptions.

Defendants concede that their actions burden fundamental constitutional rights, such as the well-established rights to refuse medical treatment, and the right of parents to direct the care and upbringing of their children. They also concede that when fundamental constitutional rights are infringed, the Court is typically required to engage in strict scrutiny analysis to ensure that the state's actions further a compelling state need and are applied in the least restrictive manner possible.

However, defendants argue that *Jacobson* requires deviation from this scrutiny, and that the Court should apply an extremely deferential version of a "rational basis test instead": *"The 'rational basis' test is easily met here because federal courts have properly held that, 'from a century of the nation's experience,' it is clear on its face that "requiring school children to be immunized rationally furthers the public health and safety.*" *See* Dkt. No. 61-24 (Defendant's Memorandum of Law), p. 14 of 26. Essentially, defendants argue that if vaccines are implicated in the issue, there should be no further scrutiny, no matter how egregious the burden on fundamental rights or individual safety, because *Jacobson* requires courts to abstain from reviewing public health decisions.

Defendants misapply *Jacobson* and the jurisprudence arising from it. As a threshold matter, plaintiffs do not agree that *Jacobson* requires an abandonment of judicial scrutiny whenever public health is invoked. On the contrary, a slew of recent circuit court cases articulate that deference does not mean abandonment of judicial scrutiny. *See, e.g., Adams & Boyle, P.C. v. Slatery*, 956 F.3d 913 (6th Cir. 2020)(recognizing the need for deference, especially in a pandemic, but stressing that "*affording flexibility, however, is not the same as abdicating responsibility, especially when well-established constitutional rights are at stake*").

15

*Jacobson* itself clarified that the deference it affords to public health decisions was not meant to apply to judicial review of challenges to medical exemptions policies, although the *Jacobson* Court did not use that more modern term explicitly. *Jacobson v. Commonwealth of Massachusetts*, 197 U.S. 11, 38–39 (1905).

The defendants seek to reframe this case as one challenging whether the state has the power to impose vaccine mandates. It does. Plaintiffs do not contest that under *Jacobson,* it is within the state's police power to require vaccination of fit subjects within appropriate limits. *Jacobson v. Commonwealth of Massachusetts*, 197 U.S. 11 (1905). Neither do plaintiffs contest that in so holding, the Supreme Court gave great deference to state legislators to weigh the evidence regarding the overall effectiveness and necessity of various public health options in the face of an emergency.

*Jacobson* expressly warned that the police power is not unlimited, however, and courts must apply stricter scrutiny to those cases that implicate medical exemptions. According to the Supreme Court, mandating a person to submit to a vaccine when that person would risk serious harm would be "cruel and inhuman in the last degree":

> Before closing this opinion we deem it appropriate, in order to prevent misapprehension as to our views, to observe—perhaps to repeat a thought already sufficiently expressed, namely—that the police power of a state, whether exercised directly by the legislature, or by a local body acting under its authority, may be exerted in such circumstances, or by regulations so arbitrary and oppressive in particular cases, as to justify the interference of the courts to prevent wrong and oppression. Extreme cases can be readily suggested. Ordinarily such cases are not safe guides in the administration of the law. **It is easy, for instance, to suppose the case of an adult who is embraced by the mere words of the act, but yet to subject whom to vaccination in a particular condition of his health or body would be cruel and inhuman in the last degree."** *Jacobson v. Commonwealth of Massachusetts*, 197 U.S. 11, 38–39 (1905)(emphasis added).

16

The Court noted that in cases where a person alleges they are "*not at the time a fit subject of vaccination, or [for whom] vaccination by reason of his then condition would seriously impair his health*", the Judiciary is not only competent to strictly review the appropriate tailoring of the medical exemption, but must do so to prevent unconstitutional application of the law:

> We are not to be understood as holding that the statute was intended to be applied to such a case, or, if it was so intended, that the judiciary would not be **competent to interfere and protect the health and life of the individual concerned**. *Id.* (emphasis added)

Defendants dismiss this strong language and the expressed need for judicial scrutiny when an individual's health may be put at risk, calling it "*dicta*". But public health law scholars acknowledge harm avoidance as part of the foundational holding of *Jacobson.* See, e.g., LAWRENCE 0. GOSTIN, PUBLIC HEALTH LAW: POWER, DUTY, RESTRAINT 126-28 (2d ed.2008)(per *Jacobson,* public health regulations require five elements to be constitutional: (1) public health necessity, (2) reasonable means, (3) proportionality, (4) harm avoidance, and (5) fairness).

Thus, whatever legal questions may be open regarding *Jacobson* and strict scrutiny analysis, they do not apply to vaccine medical exemption cases. *Jacobson* establishes unequivocally that broad medical exemptions are a prerequisite to the constitutionality of any vaccine mandate and the Court has a responsibility to strictly scrutinize these cases to avoid constitutional (and physical) harm. *Id.*

**b.  Defendants' reliance on religious exemption cases is misplaced**

Reliance on the Second Circuit's 2015 decision in *Philips v. New York* and other cases addressing the religious exemption is misplaced. *See* Dkt. No. 61-24 (Defendant's Memorandum of Law), p. 16-18 of 26. In *Philips*, the Second Circuit rejected the claim that individual liberty overcame the State's judgment that mandatory vaccination was in the population's best interest.

17

*Phillips v. City of New York*, 775 F.3d 538, 542 (2d Cir. 2015). At issue was whether Plaintiffs' *religious* rights prohibited the school from temporarily excluding unvaccinated children for a limited time during a chickenpox outbreak in the school. The Court rejected plaintiffs' allegation that the temporary exclusion unconstitutionally burdened her religious freedom or that vaccine mandates are not within the state's police power.

Defendants assert that the brevity of the *Phillips* decision implies that the Second Circuit applies a rational basis test when faced with any question involving vaccines. The questions presented in *Phillips*, however, were almost identical to those in other controlling cases and did not require extensive analysis. Rather, the Second Circuit declined to decide the issue of scrutiny in *Phillips*, noting that *"plaintiffs' substantive due process claim fails even under their [strict scrutiny] reading of Jacobson.*" *Id. at 543.*

### c.  The burdens on plaintiffs in this case are unconstitutional under any standard of review

The challenged policies and practices in this case cannot survive under any level of judicial scrutiny, leave aside the strict scrutiny that plaintiffs deserve in medical exemption cases.

Defendants' collective policies and practices are arbitrary, irrational, and present unconstitutional risks to medically fragile children and their families.

### *Defendants' Policies Bear no Substantial Relationship to a Legitimate Goal*

The challenged policies bear no real and substantial relation to legitimate public health needs. *See Adams & Boyle, P.C. v. Slatery*, 956 F.3d 913 (6th Cir. 2020)(striking down *Covid-19* executive orders that burdened women's access to abortion where they lacked a real and substantial relationship to the pandemic).

Defendants admit both by implication and explicitly that the goal of their onerous and humiliating policies and procedures is to burden the medical exemption process so as to decrease the number of children who qualify for it.

Limiting the number of children who can obtain a medical exemption at the expense of the health of medically fragile children is not a constitutional purpose. Here, defendants pursue their goal of reducing the number of medical exemptions by arbitrarily excluding deserving children and exposing them to harm. Thus, defendants defeat the state's compelling interest to protect the community and actually cause irreparable harm.

Defendants submit no evidence that their policies are necessary for permissible goals. Rather, they concede that the number of children who submit a medical exemption signed by a doctor is so small that it cannot be seriously argued to impact herd immunity at all.

As discussed above, herd immunity cannot be threatened by the small number of students seeking a medical exemption. With the current heightened measures required as a result of the *Covid-19* pandemic, it would not be plausible that a child with a medical exemption could pose any risk to the community.

The risk to the child, on the other hand is significant.

### Parents Have a Fundamental Right to Make this Decision

Defendants suggest that they may be acting in the child's interest in overruling their treating physicians and the wishes of their parents. While the state has the right to devise appropriately tailored measures necessary for the safety and health of the general community, the cost-benefit analysis as it applies to the individual child is the parent's decision, not the defendants'.

Parents have a fundamental right to direct the care and upbringing of their children, and this type of decision falls squarely within that liberty interest. *See, Troxel v. Granville*, 530 U.S. 57, 58 (2000)("There is a presumption that fit parents act in their children's best interests" and thus "there is normally no reason for the State to inject itself into the private realm of the family to further question fit parents' ability to make the best decisions regarding their children."); *see also Parham v. J.R.*, 442 U.S. 584, 604 (1979)("Simply because the decision of the parent...involves risks does not automatically transfer the power to make that decision from the parents to some agency or officer of the state. The same characterizations can be made for a tonsillectomy, appendectomy, or other medical procedure...Parents can and must make those judgments.")

It is constitutionally impermissible for the defendants to try to usurp these decisions on the basis of the existence of a difference of medical opinion between the licensed treating physician and the consulting school district doctor. It is also against the children's best interest. Parents are in the best position to be able to determine a course of action to protect their medically fragile child's health in cases where there are differing medical opinions. Parents of medically fragile children have typically spent years working with providers, diving deep into the literature and gaining first-hand experience with how their particular child reacts to various medical interventions and triggers. They love their children and they are best equipped to ask the appropriate questions, evaluate and make the final determination in the child's best interests in cases of differences of medical opinion regarding their child's safety.

### *Defendant's Policies and Practices are Dangerous*

Defendants' policies are reckless and put these children at risk of serious harm. Many of the children already suffer debilitating and serious chronic disease. Some have already been

irreparably injured by vaccines. Many have genetic predispositions or conditions that make them more susceptible to serious adverse reactions. Some of these families have already suffered one *or more* deaths due to adverse reactions from vaccines. *See, e.g.,* Dkt. 1 (Complaint – *Coe* and *Boe*).

Differences of opinion between physicians do not justify overruling the parents trusted treating physicians. The fact that a licensed physician certifies that the child is at risk of harm should be sufficient to allow a parent to opt out of a vaccine requirement. To proceed otherwise is reckless. If the school principal is wrong in overruling the physician, the child could face serious harm and even death. If the child's doctor gets it wrong, little harm can be alleged to occur to any party.

Indeed, in *Stenberg v. Carhart,* the Supreme Court held that medical exemptions cannot be overly restrictive, require absolute certainty, or hinge on unanimity of medical opinion, as defendants require here. 530 U.S. 914, 937 (2000).

Under this precedent, the challenged policies would surely be found unconstitutional.

In *Stenberg,* the Supreme Court discussed these issues at length. The case has many parallels to this one. The question was whether an otherwise permissible regulation on post-viability abortion had to contain a medical exemption and how deferential that exemption should be. The issue turned on the definition of what could be considered "necessary, in appropriate medical judgment, for the preservation of the life or health of the mother" pursuant to *Planned Parenthood of Southeastern Pa. v. Casey,* 505 U.S. 833 (1992). The *Stenberg* Court acknowledged that little science existed that could provide certainty that a woman would ever even need to use the regulated method of abortion over other arguably safe methods that remained available. The Supreme Court acknowledged that it would be a stretch to find the

evidence supported a strict reading of "necessity" but cautioned that medical exemptions must be generously applied and so held that a deferential medical exemption was required. The Court's analysis is instructive.

> The word "necessary" in *Casey's* phrase "necessary, in appropriate medical judgment, for the preservation of the life or health of the mother," …cannot refer to an absolute necessity or to absolute proof. Medical treatments and procedures are often considered appropriate (or inappropriate) in light of estimated comparative health risks (and health benefits) in particular cases. Neither can that phrase require unanimity of medical opinion. Doctors often differ in their estimation of comparative health risks and appropriate treatment. And *Casey's* words "appropriate medical judgment" must embody the judicial need to tolerate responsible differences of medical opinion." *Id.* at 937.

A recent case from the Eleventh Circuit expressly held that it is unconstitutional for a state to remove discretion from the treating physician in determinations about the need for a medical exemption. *Robinson v. Attorney General* 957 F.3d 1171 (11th Cir. 2020). In *Robinson,* the Court upheld a TRO staying emergency regulations restricting elective medical procedures. Conflicting directives were given about whether providers or the state would have "final say" over what qualified for the medical exemption from these regulations. The possibility that a treating provider could be overruled in the determination of medical necessity was deemed unconstitutional, even though defendants argued that it was necessary to protect public health. *Id.* at 1180.

The District Court recognized that though the state should be given deference in matters of public health, as established by *Jacobson*, strict scrutiny still applied in examining the substantive rights at issue. *Id.* at 1180. After an evidentiary hearing and careful consideration, the court held that the defendant's actions involved one of the carve outs in *Jacobson* for state action which constitutes "plain, palpable invasion of rights" with "no real or substantial relation" to the state's permissible goals. *Id.*

22

The Eleventh Circuit upheld the injunction, noting that unlike some of the other Circuit Court decisions overruling injunctions in a similar context, the lower court struck the appropriate balance by considering both *Jacobson* and applying that deference in the context of the *Casey* undue burdens test, which is the correct standard for reviewing the substantive fundamental right against the public health purpose. *Id.* The Court found that the state's overreach did not substantially further any it's legitimate public health goals. The Eleventh Circuit pointed out that the state merely stated hypothetical harms, such as the concern that they would run out of PPE, without actually engaging in any rigorous review of how much PPE the abortion providers might use, or any other facts to establish that would justify the state's actions.

These issues are at the forefront of public discussion and concern right now. As the cases that emerge in the context of *Covid-19* reveal, *Jacobson* does not bar rigorous constitutional analysis. The state can be given deference and still have to provide evidence that the balance of burdens has been correctly applied.

Here, the balance is not justifiable. Plaintiffs have established a sufficient chance of success on the merits, along with a requisite showing of disproportionate irreparable harm and should be granted a preliminary injunction.

The state has no permissible reason to overrule licensed doctors, arbitrarily limit the criteria for what may cause harm, or require extensive reporting and documentation that only serves to burden the right of children to a medical exemption in cases where vaccination could case them harm. Moreover, depriving children of an education, particularly in the current circumstances where they cannot arguably pose any risk to any of their classmates, cannot be justified.

Forcing these children and families to play Russian Roulette with the child's health, particularly given the lack of real and substantial need for such aggressive policies, is cruel and inhuman to the highest degree. Depriving these children of an education if their parents refuse to contravene medical advice and subject them to risk of serious harm is cruel and inhuman to the highest degree.

## CONCLUSION

Wherefore, plaintiffs respectfully request that this Court grant them a preliminary injunction so that the children can be "re-admitted" to school pending the outcome of this litigation.

Respectfully submitted,

*/s Sujata S. Gibson*
Sujata S. Gibson, Esq.
**The Gibson Law Firm, PLLC**
*Attorneys for the Plaintiffs*
407 N. Cayuga Street, Suite 201
Ithaca, NY 14850
Tel: (607) 327-4125
Email: sujata@gibsonfirm.law
Bar Roll No. 517834

Michael Sussman, Esq.
**Sussman & Associates**
1 Railroad Ave, Suite 3, PO Box 1005
Goshen, NY 10924
Bar Roll No. 123324

Robert F. Kennedy Jr., Esq., *Of Counsel*
Mary Holland, Esq., *Of Counsel*