# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF NEW YORK

JANE DOE, et al.

  Plaintiffs,

  vs.

HOWARD ZUCKER, et al.

  Defendants.

Civil Action No.: 1:20 – CV – 0840 (BKS/CFH)

**MEMORANDUM OF LAW**

## PLAINTIFFS' MEMORANDUM OF LAW OPPOSING THIRD MOTION TO DISMISS

Sujata S. Gibson, Esq., *Lead Counsel*
**The Gibson Law Firm, PLLC**
407 N. Cayuga Street, Suite 201
Ithaca, NY 14850
Tel: (607) 327-4125
 Email: sujata@gibsonfirm.law
Bar Roll No. 517834

Michael Sussman, Esq., *Lead Counsel*
**Sussman & Associates**
1 Railroad Ave, Suite 3, PO Box 1005
Goshen, NY 10924
Bar Roll No. 123324

*Of Counsel*
Robert F. Kennedy Jr., Esq., *pending admission*
Mary Holland, Esq., *pending admission*

October 26, 2020

# TABLE OF CONTENTS

Table of Contents ................................................................................................. i

Table of Authorities ........................................................................................... iii

Preliminary Statement ........................................................................................ 1

Statement of Facts .............................................................................................. 4

Standard of Review ........................................................................................... 15

Legal Argument ................................................................................................ 17

**I.    POINT ONE: THIS COURT HAS SUBJECT MATTER JURISDICTION – GOE FAMILY DAMAGES CLAIMS ARE NOT MOOT** ...................... 17

**II.   POINT II: THE CONSTITUTIONAL CLAIMS ARE FACIALLY SUFFICIENT TO WITHSTAND DISMISSAL** ............................................. 19

    **a.   The right to a medical exemption where a child may be at risk of harm is a fundamental right and requires strict scrutiny** ................................ 20

    **b.   The regulations and policies at issue place an undue burden on the fundamental right to a medical exemption for vulnerable children** ...... 24

    **c.   The challenged policies and procedures are not narrowly tailored to uphold a compelling state interest sufficient to outweigh the plaintiffs' right to a medical exemption** ................................................................ 31

    **d.   The state cannot substitute its judgment for the judgment of fit parents** ................................................................................................... 34

    **e.   Unconstitutional Conditions Doctrine bars defendants from claiming that they are excused from strict scrutiny** ............................................. 35

**III.  POINT THREE: THE REHABILITATION CLAIMS ARE FACIALLY SUFFICIENT TO WITHSTAND DISMISSAL** ............................................. 37

**IV.   POINT FOUR: PLAINTIFFS ADEQUATELY PLED MUNICIPAL LIABILITY** ..................................................................................................... 41

**V.    POINT FIVE: EXHAUSTION IS NOT REQUIRED** ................................. 44

i

CONCLUSION.........................................................................................................45

## TABLE OF AUTHORITIES

**Cases**

*All. for Open Soc'y Int'l, Inc. v. U.S. Agency for Int'l Dev.*, 651 F.3d 218 (2d Cir. 2011 ........... 36

*Ashcroft v. Iqbal,*
      556 U.S. 662 (2009) ........................................................................................... 15

*Ayotte v. Planned Parenthood of N. New England,*
      546 U.S. 320 (2006) ................................................................... 2,24,28,29,30,31

*Beyah v. Coughlin,*
      789 F.2d 986 (2d Cir.1986) ................................................................................. 17

*B.C. v. Mount Vernon Sch. Dist.,*
      837 F.3d 152 (2d Cir. 2016) ............................................................................. 38,39

*Benacquista v. Spratt,*
      217 F.Supp.3d 588 (N.D.N.Y. 2016) ................................................................. 39

*Brown v. Bd. of Ed. of Topeka, Shawnee Cty., Kan.,*
      347 U.S. 483 (1954) ......................................................................................... 37,38

*County of Riverside v McLaughlin,*
      500 US 44 (1991) .................................................................................................. 18

*Cruzan v. Director, Mo. Dept. of Health,*
       497 U.S. 261 (1990) ............................................................................................ 23

*D.A.B. v. N.Y.C. Dept of Educ.,*
      45 F. Supp.3d 400 (S.D.N.Y. 2014) ................................................................... 39

*Dean v. Blumenthal,*
      577 F.3d 60 (2d Cir. 2009) .................................................................................. 17

*Deposit Guaranty National Bank v Roper,*
      445 US 326 (1980) ................................................................................................ 18

*DiMartile v. Cuomo,*
      No. 120CV0859GTSCFH, 2020 WL 4558711 (N.D.N.Y. Aug. 7, 2020) ................... 33

*Doe v. Bolton,*
   410 U.S. 179 (1973) .................................................................................. 2,4,5,25,27

iii

*Easton v. Sundram,*
     947 F.2d 1011 (2d Cir. 1991).............................................................................. 16

*Fox v. Bd. of Trs. of the State Univ. of N.Y.,*
     42 F.3d 135 (2d Cir.1994).................................................................................... 16

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.,*
     528 U.S. 167 (2000) ............................................................................................ 17

*Griswold v. Connecticut,*
     381 U.S. 479 (1965)............................................................................................. 20

*Hayden v. County of Nassau,*
     180 F.3d 42 (2d Cir.1999).................................................................................... 16

*Jacobson v. Massachusetts,*
     197 U.S. 11 (1905)..............................................................2,3,21,22,23,27,33

*King v. Simpson,*
     189 F.3d 284 (2d Cir.1999).................................................................................. 16

*Koontz v. St. Johns River Water Mgmt. Dist.,*
     570 U.S. 595 (2013) ............................................................................................ 36

*Makarova v. United States,*
     201 F.3d 110 (2d Cir. 2000) ................................................................................ 16

*Matter of Hofbauer,*
     47 N.Y.2d 648 (1979) ............................................................................... 15,18,19

*Monell v. Department of Social Services of the City of New York,*
     436 U.S. 658 (1978) ............................................................................................ 42

*Neitzke v. Williams,*
     490 U.S. 319 (1989)............................................................................................. 16

*Nettis v. Levitt,*
     241 F.3d 186 (2d Cir.2001).................................................................................. 16

*Obergefell v. Hodges,*
     576 U.S. 644 (2015)............................................................................................. 20

*Parham v. J.R.,*

iv

442 U.S. 584 (1979) ................................................................................................... 34

*Patsy v. Bd. of Regents of State of Fla.,*
457 U.S. 496 (1982) ................................................................................................ 44

*Perry v. Sinderman,*
408 U.S. 593, 597 (1972) ........................................................................................ 35

*Planned Parenthood of Southeastern Pa. v. Casey,*
505 U.S. 833 (1992) ......................................................................................23,28,29

*Poe v. Ullman,*
367 U.S. 497 (1961) ................................................................................................ 20

*Reno v. Flores,*
507 U.S. 292 (1993) ................................................................................................ 20

*Robinson v. Attorney General*
957 F.3d 1171 (11th Cir. 2020) .........................................................................27,28

*Rumsfeld v. Forum for Academic and Institutional Rights, Inc.,*
547 U.S. 47 (2006) .................................................................................................. 36

*Sarmiento v. U.S.,*
678 F.3d 147 (2d Cir.2012) ...............................................................................15, 16

*Soos v. Cuomo,*
No. 120CV651GLSDJS, 2020 WL 3488742, at *8 (N.D.N.Y. June 26, 2020) ............33

*Sosna v. Iowa,*
419 US 393 (1975) .................................................................................................. 18

*Steffel v. Thompson,*
415 U.S. 452 (1974) ................................................................................................ 16

*Stenberg v. Carhart,*
530 U.S. 914 (2000) ......................................................................................25,29,31

*Stokes v. Vill. of Wurtsboro,*
818 F.2d 4 (2d Cir.1987) ......................................................................................... 17

*Troxel v. Granville,*
530 U.S. 57 (2000) .................................................................................................. 34

v

*United States Parole Commission v Geraghty*,
    445 US 388 (1980) ........................................................................................ 18

*Washington v. Glucksberg,*
    521 U.S. (1997)............................................................................................. 20

*Wallis v. Spencer*,
    202 F.3d 1126 (9th Cir. 2000) ...................................................................... 34

*Whalen v. Roe,*
    429 U.S. 589 (1977).......................................................................................15

**Statutes**

N.Y. P.H.L. §2164 .............................................................................................5,27,43

29 U.S.C. § 794(a)(Section 504) .....................................................................38,39,40

10 NYCRR §66-1.1 .................................................................................................5,43

10 NYCRR §66-1.3 .................................................................................................5,43

42 U.S.C. § 12182 .....................................................................................................38

34 C.F.R. ....................................................................................................................38

45 C.F.R. ...................................................................................................................38

**Federal Rules of Civil Procedure**

FED. R. CIV. P. 12(b)(1)...........................................................................................16

FED. R. CIV. P. 12(b)(6)...........................................................................................16

**Other Authorities**

Lynn A. Baker, <u>The Prices of Rights: Toward a Positive Theoy of Unconstitutional Conditions</u>,
75 CORNELL L Rev. 1185 (1990)................................................................................36

Lawrence O. Gostin, <u>Public Health Law: Power, Duty and Restraint</u>, 126-28 (2d ed.2008)......22

vi

Albert J. Rosenthal, <u>Conditional Federal Spending and the Constitution</u>, 39 STAN. L. REv. 1103, 1114 (1987) ...........................................................................................................36

Kathleen M. Sullivan, <u>Unconstitutional Conditions</u>, 102 HARV. L. REV. 1413, 1421-22 Q989) ...........................................................................................................................36

Plaintiffs respectfully submit this memorandum of law in support of their opposition to defendants' motion to dismiss dated September 24, 2020, *See* Dkt. No. 78. For the reasons set forth in this memorandum of law the Court should deny defendants' motion.

## PRELIMINARY STATEMENT

Last year, the New York State Legislature repealed the long-standing religious exemption to vaccines contained in the New York Public Health Law. However, they expressly elected to keep the medical exemption intact without any changes or alterations.

Without direction from the Legislature and in contravention of this legislative decision, the New York State Department of Health elected to implement new regulations beginning in August 2019 which substantially undercut the availability of the medical exemption for children who need it. Individual school districts went even further and adopted discretionary policies resulting in the removal of hundreds of medically fragile children across the state.

The challenged policies and practices, both on their face and as applied, unconstitutionally burden all families seeking a medical exemption, whether their child is ultimately removed from school or not. The challenged actions are arbitrary, capricious, and unjustified to further any legitimate state interest.

Defendants dangerously impose an inflexible definition of "what may cause harm," in such a narrow way as to deprive treating physicians from using their best medical judgment and limiting them to the consideration of a small fraction of the known serious adverse reactions to vaccinations. Individual school districts adopted policies and procedures which narrow the definition even further than the DOH regulations and allow school principals to overrule treating physicians without even bothering to provide a reason or an opportunity to supplement the record in many instances. Even when they do rely on advice from their consultants, suck infringement is not safe or appropriate. Recklessly relying on consultants who have never met the child or

1

spoken with the parents, the schools have usurped parental decision making and deny valid medical exemptions if the consultant does not agree with the treating doctor's determination or interpretation of the complex ACIP guidelines and evidence-based standards of care. Where there are differences of medical opinion from two licensed physicians, parents must decide.

The challenged policies will likely not withstand any level of judicial review. A sufficient medical exemption has been recognized as a prerequisite to any constitutionally-sound vaccine mandate for a hundred and fifteen years. *Jacobson v. Commonwealth of Massachusetts*, 197 U.S. 11 (1905). Controlling precedent from the U.S. Supreme Court expressly forbids burdens on medical exemptions which subordinate the professional judgment of treating physicians. *Doe v. Bolton,* 410 U.S. 179, 199-200 (1973)(striking down restrictions on a medical exemption substantially similar to the ones at issue, holding that the patient's chosen medical provider must have discretion in decisions about what may constitute harm: "*if a physician is licensed by the State, he is recognized by the State as capable of exercising acceptable clinical judgment*"). *Doe* held that it is unconstitutional to require corroboration of a licensed physician's opinion or to allow the chosen physician's best medical judgment to be overruled by other licensed physicians or the state. Certainly, allowing a school principal to overrule the parents' chosen physician is unlawful under this binding precedent.

Medical exemption cases require strict scrutiny, and even where the possibility for harm alleged is only hypothetical and unlikely, the Supreme Court has deemed the exemption constitutionally insufficient. *Stenberg v. Carhart.* 530 U.S. 914, 937 (2000); *Ayotte v. Planned Parenthood of N. New England,* 546 U.S. 320, 325 (2006).

The allegations in this case establish violations of other fundamental rights as well – including the right to informed consent, fundamental parental rights, educational rights, equal protection rights, fundamental privacy rights. Defendants actions also violate the doctrine of

2

unconstitutional conditions. It is well-settled law that if the state cannot take the action in the first place (that is forcing medically fragile children to submit to immunization against medical advice in cases where it might harm or kill them), they cannot get around it by trying to coerce families through denying the children an education. All of these rights require strict scrutiny and cannot be dismissed without independent inquiry from this Court.

Rather than address the clear constitutional issues, defendants allege that Plaintiffs cannot prevail because the Supreme Court already decided that states may impose vaccine mandates in *Jacobson v. Commonwealth of Massachusetts*, 197 U.S. 11 (1905). However, that is not the issue before the Court.

Plaintiffs do not challenge *Jacobson* or its holding that states can enact compulsory immunization requirements under certain circumstances. On the contrary, Plaintiffs rely on *Jacobson,* which also expressly held that a sufficient medical exemption is a constitutional prerequisite to the state's use of its police power to impose any mandates. Just as a person's fundamental rights are not absolute and may be constrained by compelling state need under narrowly tailored circumstances, the state's interests are not unlimited either. *Jacobson* made it very clear that a state can require the public to submit to a vaccine to protect the community, but not if the individual could face physical harm from the vaccine. *Id.* at 38-39.

School district defendants attempt to sidestep responsibility, claiming that the state defendants are solely responsible for the unconstitutional policies and practices, and they are simply administering the law. However, under the new regulations, school principals and individual districts are empowered to overrule physicians but *are not required to do so.* So long as a child has a medical exemption certified by a licensed physician, the school does not have to go further and attempt to contravene the good-faith medical determinations of licensed doctors chosen by the fit parents of medically fragile students in their schools. Nor do they have to ask

3

families to seek corroborating opinions from multiple specialists, or "ensure" the treating doctor got it right or ask for additional documentation. The named districts have chosen to engage in these behaviors, often in outrageous and conscience shocking degrees. As the evidence will show, each of these named defendant districts have adopted policies that narrow the grounds for a medical exemption even more than the DOH has done.

Besides fundamentally misconstruing the issues, Defendants cite to inapposite cases that do not extend state authority or judicial discretion nearly as far as they assert. Plaintiffs' complaint establishes multiple viable causes of action and should not be dismissed.

## STATEMENT OF FACTS

Pursuant to Public Health Law §2164 ("PHL §2164), all parents of children between the ages of two months and eighteen years are required to arrange for their children to receive over fifty doses of various immunizations at specified intervals during childhood. PHL 2164(2). The statute does not limit this requirement to children who attend school. School is implicated because PHL §2164 also imposes requirements on school principals, or "persons in charge of a school" to ensure that the child has submitted either a certificate of immunization for all age-appropriate doses required under the statute, or a certification from a doctor licensed to practice in New York exempting the child from the requirement.

The statutory medical exemption is broad and deferential, stating: "*If any physician licensed to practice medicine in this state certifies that such immunization may be detrimental to a child's health, the requirements of this section shall be inapplicable.*" PHL §2164(8).

The New York legislature reached the limits of permissible infringements on the medical exemption in enacting Public Health Law §2164(8). This language exactly tracks with the requirements for medical exemptions and the rights of patients to make medical decisions in

4

accordance with the best medical judgment of their chosen physician set forth by the Supreme Court in *Doe v. Bolton,* 410 U.S. 179 (1973)*.*

In 2019, the New York State Legislature considered and decided not to burden or repeal the medical exemption any further than the limits of §2164(8). Acting without direction to do so from the Legislature, the DOH defendants promulgated regulations in August 2019 which restrict the medical exemption beyond the allowable limits of *Doe v. Bolton*. These new regulations as well as additional policies and practices adopted by the school district defendants are challenged in this lawsuit.

Pursuant to statute and regulation, school districts are not required to determine the "sufficiency" of a treating physician's opinion. Though the new regulations allow school districts to request additional information through new amendments to 10 NYCRR §66-1.3(c), this is discretionary. The school principal is only required, even under the new regulations, to ascertain that a physician licensed to practice in New York signed the exemption request, that it was submitted on the correct form and that it specifies the reason a child should be exempt from any particular vaccine and for how long a child should be exempt from each. 10 NYCRR § 66-1.1(1).

Individual districts and school district employees in this case have elected to engage in burdensome reviews, narrow the standards of what may cause harm even further than the DOH, and allow school principals with no medical training to overrule treating physicians, in at least one instance, without even relying on medical advice or disclosing the reasons.

Plaintiffs bring this suit as a putative class action lawsuit. The named plaintiffs asserting claims against the school district defendants implicated in this motion to dismiss are (1) the family of *John Doe*, addressing unconstitutional policies and procedures of the Coxsackie-Athens School District, Superintendent Randall Squier and Principal Freya Mercer (*see* Dkt 1 (complaint) Par. 88-109); (2) the family of *Jane and John Coe,* addressing unconstitutional

policies and procedures of the Lansing Central School District, Superintendent Chris Pettograsso and Principals Christine Rebera and Lorri Whiteman (*Id.* par. 137-160); and (3) the family of *Jane Goe*, addressing claims against the Penfield Central School District, and Superintendent Dr. Thomas Putnam (*Id.* par. 181-204).[1]

### The Doe Family

John Doe is a fifteen-year-old boy whose diagnoses include mitochondrial disorder, hypoglycemia, genetic mutations, environmentally induced porphyria, metabolic and hormonal imbalances, eczema, food and environmental allergies, candida infection, amino acid disorder, heavy metal toxicity and multiple autoimmune disorders including Pediatric Autoimmune Neurological Disorder Associated with Streptococcus ("PANDAS"), Irritable Bowel Syndrome ("IBS"), thyroid disease and Gluten Sensitive Enteropathy. *See* Dkt 1 (complaint) ¶¶88-89. John's conditions are chronic, incurable, and at times completely debilitating. *Id.* ¶ 90. John's disabilities significantly impair multiple major life functions including but not limited to functions of his immune system. Because of his disabilities, John is unable to take vaccines or interact with other typical levels of toxic exposure without significant harm to his health and regression of his debilitating neurological and physical symptoms.

In August 2019, John submitted certifications from two licensed treating physicians certifying that John cannot safely take vaccines. One is the specialist from the practice in Massachusetts that has been treating and managing John's conditions since he was four years

---

[1] This motion is also brought by the attorneys for the *Shenendehowa School District* defendants. However, the *Koe* family plaintiffs filed a voluntary notice of dismissal of their action and participation in the suit as named plaintiffs. Therefore, all claims against the *Shenendehowa School District Defendants* were dismissed prior to the filing of this motion response.

old. The other is from Dr. Peter Forman, a well-respected pediatrician who has been John's primary care provider for over ten years. *Id.* ¶90.

Coxsackie-Athens School District defendants overruled John's treating physicians' recommendations on the ground that the physicians had not adequately spelled out how the exemption request qualifies under ACIP in their forms. *Id.* ¶ 93.

The Coxsackie-Athens School District, through their paid consultant, Dr. Stephen G. Hassett, refuses to consider any medical contraindications that do not fit within a very narrow reading of the ACIP guidelines. Dr. Hassett has no expertise or experience in John's conditions or even in treating children. *Id.* ¶94. He has never examined John and neither he nor the school district defendants made any attempt before denying the request to inquire into how the exemption fit into ACIP or even acknowledge that it could also fall under other nationally recognized evidence-based standards of care. *Id.*

Coxsackie-Athens School District defendants refused the mother's request to provide supplemental information or arrange a call between the treating physicians and doctor Hassett to discuss the ACIP guidelines' application to his exemption needs. *Id.* ¶95. After the summary denial of the exemption, Dr. Forman called Dr. Hassett and asked why the exemption was denied. Dr. Forman told him that he was obligated to follow the strict guidelines set forth by ACIP and could not consider any supplemental information outside of the initial form, including any phone call with the treating physicians, to determine if a condition falls within the ACIP guidelines. *Id.* ¶96.

On Saturday, October 5, 2019, the family submitted a second medical exemption from Dr. Forman. In this request, Dr. Forman provided detailed analysis and information for each vaccine about how the child's medical conditions qualified for precautions or contraindications under the ACIP guidance. *Id.* ¶97. Within 24 hours of receiving this second request, the school

denied the second request with no explanation at all other than that the second request was "unsupported." The school did not request any follow up supporting information or clarify what they meant or wanted to show support. When the mother reached Dr. Hassett by phone after receiving the second denial, he acknowledged that the second forms did articulate the reasons that John qualified under ACIP, but said that he was recommending denial anyway and refused to explain or "debate" with the mother. *Id.* ¶ 104. Defendants Squire and Mercer refused to provide any explanation or opportunity to be heard.

John appealed the decision to the Commissioner of Education on or about November 5, 2019. The case pended without decision for over eight months, until shortly after this action was filed. No hearing was held and the Coe family was never allowed to appear. Two members of the New York State Assembly wrote letters in support of John's appeal, noting that the new regulations were being applied in a manner that was antithetical to the Legislative intent and plain language of the statute. *Id.* ¶109. The Legislators both stressed that the New York State Legislature never intended or passed any law that would allow schools to overrule treating physicians. The plain language of the statute does not allow schools to overrule doctors or for schools to narrow the criteria that doctors can consider regarding what may cause harm to a child's health.

After this suit was filed, the Commissioner denied the appeal on the grounds that under the new rules, families and treating physicians have the burden of proving to the school district in their initial forms that the child's condition falls under ACIP. In response to Doe's argument that requiring this level of specificity on a basic school form was overly burdensome and they should have had a chance to supplement the information if the school did not understand how the ACIP guidelines were met, the Commissioner stated that since the rules give schools discretion whether or not to request supplemental information, they did not violate the

regulations by failing to do so.

This ruling places enormous burdens on physicians and families, forcing physicians to certify with impossible specificity all of the bases for their exemption recommendation and the legal analysis for how that falls under complex ACIP regulations, which is far beyond the scope of what most doctors are willing or able to do for patients.

Moreover, the ACIP guidelines are not exhaustive and cannot predefine the limits of what might be detrimental to a child's health. *See* Dkt 1 (complaint) ¶¶267-301. On December 28, 2019, John's mother received correspondence from Anthony T. Kroger, a spokesperson for ACIP and the author of the newest edition of the CDC's guidelines on immunization. He clarified that the ACIP guidelines are not meant to serve as an exhaustive list of reasons for a medical exemption: "*The ACIP guidelines were never meant to be a population-based concept…The CDC does not determine medical exemptions. We define contraindications. It is the medical providers prerogative to determine whether this list of conditions can be broader to define medical exemptions.*" *See* Dkt 1 (complaint) ¶268. The Coxsackie-Athens School District defendants refused to reconsider their narrow application of ACIP, modify their refusal after receipt of this email or the letters from NYS Legislators, or explain what further information they needed to cure their finding of "lack of support" for John's exemption.

These practices are clearly unconstitutional. But the Commissioner cannot examine or analyze the constitutionality of a statute, or any issue requiring interpretation of the New York or United States Constitutions. See, e.g., *Appeals of Students with Disabilities*, 33 Ed Dept Rep 276, Decision No. 13,047.

### The Coe Family

John Coe, Sr.'s brother died from an adverse reaction to vaccines as a baby. His death certificate documents the cause of death from adverse reaction to vaccines. The family proved

the cause of death in a hearing and received compensation from the National Vaccine Injury Compensation Program. *Id.* ¶ 138. Multiple other members of the family suffered serious adverse reactions to vaccines. In addition to serious reactions suffered by John Coe, Sr., his sister and their mother (who is a registered nurse), John's cousin also died from an adverse reaction to her two-month vaccines. *Id.* ¶140.

On the advice of medical professionals, John Sr. and his children have not been immunized since the second death in the family. The Coe children carry genetic mutations and markers that indicate the same vulnerability as their deceased family members to serious vaccine injury or death. They also have multiple food, environmental, and drug allergies and precarious health. *Id.* ¶¶141-143. The children's disabilities significantly impair multiple major life functions including but not limited to functions of their immune systems. *Id.* ¶145.

In August 2019, the family submitted a medical exemption written by a licensed physician and supplemented by a letter from a genetic counselor who has been working with the family for many years. The Lansing Central School District accepted the exemptions and the children attended school from August 2019 through the end of January 2020. *Id.* ¶¶149-150.

On January 21, 2020, without warning, the family received an email from defendant Pettograsso, the Superintendent of the Lansing Central School District, stating that the "building principals" for the children's respective schools (defendants Rebera and Whiteman) had rejected the medical exemptions and the children would need to get eleven different vaccines within one week or else would be removed from school. *Id.* ¶150. Attached to the correspondence was a letter dated December 5, 2019, written by defendant Rausch-Phung from the Department of Health and sent to the school. Defendant Rausch-Phung indicated that the death of a family member from vaccines was not enumerated under ACIP as a contraindication. She further noted that she was unable to determine whether the children's genetic vulnerabilities were a

"contraindication" (she made no mention of precautions or other nationally recognized evidence-based standards of care). Therefore, she stated the family should seek a corroborating opinion from a pediatric genetic specialist and submit additional information if they wanted the exemption to be considered. The school district did not advise the Coe family of this recommendation from the DOH or indicate that they needed any follow up information or opinions before making their final determination to overrule the Coe children's doctor on January 21st, 2020. *Id.* ¶¶152-154.

The Coe family, through counsel, responded within days by letter to the school district and their attorneys. They pointed out the unconstitutionality of requiring a specialist to corroborate the opinion but nonetheless asked the Lansing Central School District defendants for a short additional extension of time to attempt to comply with his corroboration request. The only pediatric genetic specialist that they were aware of in the state was scheduling new patients a year or more out. The family requested at least a few months to try to expedite a new appointment.

Defendants denied the request and stated that the two building principals had made their decisions to overrule the Coe family physician "independently" from the advice of defendant Rausch-Phung or any other cited medical professional. They refused to provide any notice of the grounds of denial or any opportunity to be heard on the issue, stating only, "*finally, you cite your 'serious concerns' about the legality of the denial process…[relating to the NYSDOH recommendations]…However, this statement from a recommendation from the Department of Health was neither relied upon nor cited by the district in its decision to deny the medical exemption request.*" *Id.* ¶157. The Coe children were removed from school on or about January 29, 2020. *Id.*¶178.

## The Goe Family

11

Jane Goe is a seventeen-year-old young woman who suffers from multiple severe autoimmune conditions and genetic mutations that are well-established as putting her at serious risk of harm from certain vaccines. Her diagnoses include type I Diabetes, Celiac Disease, Hashimoto's Thyroiditis, Alopecia Areata and Polycystic Ovarian Syndrome. Her cascading and multiplying autoimmune conditions were triggered by a vaccine received in the third grade. Within short order, she lost half her hair, developed five serious autoimmune conditions, and became so debilitated that she was unable to attend school or participate in meaningful opportunities of childhood for significant periods in the years that followed. *Id.* ¶¶181-184.

Vaccines have been shown to trigger autoimmune disease in susceptible individuals. Jane's family history reveals serious propensity towards autoimmune disease and she carries a rare HLA genotype which places her at high risk of developing Guillain-Barre syndrome (an acknowledged potential severe adverse reaction to vaccines which causes death and/or paralyzation). Jane is up to date on all vaccines except the meningococcal vaccine and the fifth dose of the tetanus, diphtheria, and pertussis containing vaccine (Tdap). *Id.* ¶189. No component of any of the vaccines Jane is missing can provide any benefit to herd immunity. These vaccines are all acknowledged by uncontroversial scientific consensus to provide personal protection only but still allow asymptomatic infection and transmission. *Id.* ¶190. Jane's medical disabilities significantly impair multiple major life functions, including but not limited to functions of her immune system. *Id.* ¶¶184. 187.

Jane's primary care physician, who has been working with Jane and her family for years to get Jane's health to a minimal level of functionality submitted a medical exemption on August 18, 2019 that meets the criteria under the ACIP contraindications and precautions and is supported by other nationally recognized evidence-based standards of care. *Id.* ¶188.

On September 11, 2019, the school district defendants denied Jane's medical exemption

on the advice of Dr. Robert J. Tuite, who is a pediatrician specializing in sports medicine with no expertise in Jane's conditions. Dr. Tuite made it clear he does not consider anything other than the ACIP contraindications as valid reasons for exemption. *Id.* ¶194. With the knowledge and consent of the named defendants, he has further narrowed the ACIP contraindications so that absent corroboration by one of two specialists that he "trusts" he will not consider exemption requests from any other doctor or specialist that he finds "complicated" in any way.

On the advice of Dr. Tuite, the Penfield School District read the ACIP guidelines as requiring that Jane actually *suffer* Guillaine-Barre syndrome (through death or paralysis) after administration of a specific vaccine before she could be exempt. And even then, she would only be exempt from that vaccine which caused her paralysis or death. If she survived, she would then have to get Guillaine-Barre syndrome from the other vaccines as well before she'd be exempt from those. They also stated that a licensed physician was not qualified to make medical exemption determinations, even though Jane's doctor has decades of experience and understands Jane's health better than any other doctor in the state. Instead Jane's family had the burden of submitting an exemption from a specialist before the exemption would be considered pursuant to Dr. Tuite's advice. *Id.* ¶192. Jane was given fourteen days to find a specialist that could see her and evaluate her, secure a certification against immunization and submit it to the school or she would be removed and deprived of an education. *Id.*

With great difficulty, Jane's mother was able to get an appointment with a highly qualified specialist, Dr. Craig Orlowski. She did this by taking time off work, calling every specialist she could think of repeatedly, and camping out outside of Dr. Orlowski's office to beg for an appointment. Dr. Orlowski is the Chief of Pediatric Endocrinology at the University of Rochester Golisano Children's Hospital. He has been practicing medicine for over forty years. He is an Association Professor of Clinical Pediatrics at the University of Rochester Medical

School and has published widely on many of the conditions Jane suffers from. Dr. Orlowski

agreed that Jane could not safely take the Tdap or Meningococcal vaccine and wrote an

exemption. *Id.* ¶193.

Dr. Orlowski's exemption was submitted to the school on September 18, 2019. Later

that same day, Jane's mother received an email from defendant Putnam, alerting her that her

second exemption was also denied. Forwarded with the email was a response from Dr. Tuite,

who is not a specialist, primarily works in sports medicine, and has no expertise in Jane's health

conditions or familiarity with her health needs. He said "*Dr. Putnam, I have a lot of admiration*

*for Dr. Orlowski as a pediatric endocrinologist but quite frankly I feel that he is out of his scope*

*of practice/expertise within this area of immunization issues…I would highly recommend a*

*referral to either a pediatric infectious disease/immunology specialist such as Dr. Geoffrey*

*Weinberg at Gollisano Children's Hospital or an immunologists such as Dr. Syed*

*Mustafa…who both have a wealth of experience and expertise in this area of immunization*

*appropriateness. I have in the past and would now honor and trust their opinion and abide by*

*their advice in these kinds of complicated situations.*" *Id.* ¶194.

The next day, Jane was humiliated in front of her peers, barred from school and even

attending the homecoming events she was supposed to participate in (which were open to the

public) and many people at school were told by the defendants that she was removed for failure

to vaccinate. *Id.* ¶196.

With her daughter now kicked out of school and deprived of an education, Jane's mother

again had to take time off of work and try to get an appointment with one of the two specialists

that the school district indicated were *the only* doctors that they would consider an exemption

request from. She was unable to get an appointment. However, she had the idea to show the

denial to Dr. Orlowski, who was so offended that he marched over to Dr. Weinberg's office,

14

one of the two only doctors in the state that Dr. Tuite "trusts" enough to consider, and showed

him the letter. Dr. Weinberg was shocked and immediately wrote a letter corroborating Dr.

Orlowski's opinion and recommending that Jane be exempt at least through the fall semester as

she was experiencing an acute flare of symptoms and was at risk of exacerbating her condition.

*Id.* ¶¶196-198.

Reluctantly, the defendants had to admit Jane back into school. However, they only

admitted her until January 2020, when they would require Jane to go through the whole process

again and submit another medical exemption. *Id.* ¶199. To try to stave off the same horrific

experience, Jane's family had to hire an attorney and a team of consultants to write the January

exemption. They never received an acceptance back. Jane spent every day of the rest of her

senior year terrified that a letter would come in the mail announcing that her exemption was

denied and she would not be able to graduate with her class.

Jane's family had to incur legal expense, loss of work, trips to multiple specialists and

enormous stress, anxiety and impact on the whole family, and on Jane particularly, whose

emotional and physical health suffered under the burden. Jane did graduate, after the filing of

the complaint, before any denial or acceptance of her subsequent exemption requests was

received back. The family seeks compensatory and other damages for the violation of their

constitutional rights and a declaration that their rights were violated.

## **STANDARD OF REVIEW**

**Failure to State a Claim:** "To survive a motion to dismiss, a complaint must contain

sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its

face." *Sarmiento v. U.S.,* 678 F.3d 147 (2d Cir.2012)(quoting *Ashcroft v. Iqbal,* 556 U.S. 662,

678, (2009)). "A claim has facial plausibility when the plaintiff pleads factual content that allows

the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (internal citations omitted).

In considering a motion to dismiss for failure to state a claim pursuant to Fed.R.Civ.P. 12(b)(6), "the Court must accept all factual allegations of the complaint as true and draw all reasonable inferences in favor of the nonmoving party." *Hayden v. County of Nassau,* 180 F.3d 42, 54 (2d Cir.1999); *Sarmiento v. United States,* 678 F.3d 147, 152 (2d Cir. 2012).

The Court may not dismiss the complaint unless it is certain that Plaintiffs can prove no set of facts that would entitle them to relief. *Neitzke v. Williams,* 490 U.S. 319, 326-27 (1989); *Nettis v. Levitt,* 241 F.3d 186, 191 (2d Cir.2001). Therefore, the issue before the Court on such a motion "is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *King v. Simpson,* 189 F.3d 284, 287 (2d Cir.1999). This caution against dismissal applies with even greater force where plaintiffs allege civil rights violations. *Easton v. Sundram*, 947 F.2d 1011, 1015 (2d Cir. 1991).

**Lack of Subject Matter Jurisdiction 12(b)(1):** A district court must dismiss a case for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it. See FED. R. CIV. P. 12(b)(1). When resolving a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1), a district court may refer to evidence outside the pleadings without converting the motion into a motion for summary judgment. *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000). A court "may consider affidavits and other materials beyond the pleadings to resolve the jurisdictional issue, but [it] may not rely on conclusory or hearsay statements contained in the affidavits." *J.S. ex rel. N.S.*, 386 F.3d at 110.

*Mootness.* A court lacks subject matter jurisdiction if a case is moot. *Fox v. Bd. of Trs. of the State Univ. of N.Y.,* 42 F.3d 135, 140 (2d Cir.1994); *see also Steffel v. Thompson,* 415 U.S.

452, 459 (1974) ("The rule in federal cases is that an actual controversy must be extant at all stages of review, not merely at the time the complaint is filed."). "A case might become moot if subsequent events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.,* 528 U.S. 167, 189 (2000) (internal quotation marks omitted). There are many exceptions to the mootness doctrine, as detailed below.

## LEGAL ARGUMENT

### I.   POINT ONE: THIS COURT HAS SUBJECT MATTER JURISDICTION - GOE FAMILY DAMAGES CLAIMS ARE NOT MOOT

Defendants argue that claims against the Penfield School District defendants are moot because Jane Goe graduated shortly after filing this complaint.

However, the Goe family seeks compensatory and other damages and has not been made whole for the constitutional violations that already occurred. Thus, the Goe family claims for are not moot. "Claims for damages or other monetary relief automatically avoid mootness, so long as the claim remains viable." *Stokes v. Vill. of Wurtsboro,* 818 F.2d 4, 6 (2d Cir.1987) (quoting 13A Charles Alan Wright, Arthur R. Miller, & Edward Cooper, *Federal Practice and Procedure* § 3533.3 (2d ed.1984)); *see also Beyah v. Coughlin,* 789 F.2d 986, 988–89 (2d Cir.1986) (holding that an allegedly unconstitutional practice, which no longer affects plaintiff, "may well moot [plaintiff's] claims for declaratory and injunctive relief" but does not moot the request for damages). Even if claims for actual damages are speculative, "[i]t is clear that nominal damages are available in actions alleging violations of constitutionally protected rights." *Dean v. Blumenthal*, 577 F.3d 60, 66 (2d Cir. 2009).

The Goe family's rights were grossly violated, and they incurred expenses, missed work, had to pay for and obtain multiple corroborating opinions from specialists and hire attorneys to

work with their doctors to help the school to understand how the exemption requests fit under ACIP.

The proposed amended complaint clearly articulates the Goe family claim for compensatory damages against the school district and names defendant Putnam in his personal capacity acting under color of state law which could give rise to nominal or punitive damages as well. The claim for damages has been more clearly pled in the proposed amended complaint, but it was in the original complaint too. *See* Dkt 1 (complaint) ¶28 – Jurisdiction and Venue – "*This is a civil action seeking injunctive relief and damages for the continuing violation of plaintiffs' rights arising under the Fifth and Fourteenth Amendment to the United States Constitution as made actionable pursuant to 42 U.S. C. sec 1983.*"

Moreover, mootness is not straightforward in a class action suit. In 1975 in *Sosna v. Iowa,* 419 US 393 (1975), the Supreme Court acknowledged that there is a critical difference between bringing an action as an individual (which would have been moot) and bringing the action on behalf of a class. The Supreme Court held that the issue "does not inexorably become moot by the intervening resolution of the controversy as to the named plaintiffs." Id at 399-402. It is well-settled law now that after class certification, mootness of a named individual does not end the case or controversy. Though the law is less clear if mootness occurs after the filing of a class action suit but before certification, there is support that mootness would not apply here either. Several Supreme Court cases have denied mootness claims even where plaintiffs became moot before a certification of a class occurred. *See, e.g., Deposit Guaranty National Bank v Roper*, 445 US 326 (1980)(mootness occurred before class certification on appeal of denial for class certification); *United States Parole Commission v Geraghty*, 445 US 388 (1980)(appeal could continue though the named plaintiff's claim in an uncertified class was moot); *County of Riverside v McLaughlin*, 500 US 44 (1991)(denying mootness claim even though named

plaintiffs' case became moot prior to certification and holding that her status related back to the time of filing the action, not filing the class certification motion).

As the *Goe* family retains damages claims which are not moot in any event, plaintiffs will not spend time parsing the similarities and dissimilarities of the mootness before certification doctrine as it applies to the Goe's equitable claims other than to preserve the legal argument in case it becomes relevant at a later stage.

***Official Capacity Claims***. Defendants also seek dismissal of claims against the public school officials sued in their official capacity as duplicitous since the school districts are named. Plaintiffs have submitted a motion to amend their complaint so that the individual school district defendants are named in their personal capacities.

***Claims against Shenendehowa School District (Koe Family)***. The Koe family exercised their right to voluntarily discontinue their action and all claims against the Shenendehowa School District Defendants have been dismissed without prejudice.

## II.     POINT TWO: THE CONSTITUTIONAL CLAIMS ARE FACIALLY SUFFICIENT TO WITHSTAND DISMISSAL

Defendants acknowledge that there are multiple fundamental rights infringed in this case. Plaintiffs' complaint clearly articulates impermissible infringements on: the right to life (and self-defense of life by refusal to take a pharmaceutical product which puts an individual at serious risk of harm or death), the right to informed consent, the right to refuse medical treatment, the right to make medical decisions in consultation with one's chosen physician's unburdened best medical judgment, fundamental parental and educational rights, equal protection rights, and privacy rights. All of these rights are implicitly contained in the specific and well-established right to a medical exemption from an otherwise permissible school vaccine regulation if a licensed physician has certified the individual is at risk of serious harm.

**Constitutional Claims Standard of Review.** Under the Due Process Clause of the Fourteenth Amendment, no state shall "deprive any person of life, liberty, or property without due process of law." The Fifth and Fourteenth Amendments guarantee of "Due Process of law" includes "a substantive component, which forbids the government to infringe certain 'fundamental' liberty interests at all, no matter what process is provided, unless the infringement is narrowly tailored to serve a compelling state interest." *Reno v. Flores*, 507 U.S. 292, 293, 299 (1993); *Griswold v. Connecticut,* 381 U.S. 479, 484–486, (1965); *Obergefell v. Hodges*, 576 U.S. 644, 663 (2015).

The first step in a substantive due process analysis is to carefully identify the right Plaintiffs allege to be infringed. *Washington v. Glucksberg,* 521 U.S. 702, 721 (1997). The standard of review of the substantive due process claim arises from the nature of the infringed right. The identification and protection of fundamental rights is an enduring part of the judicial duty to interpret the Constitution, but that responsibility cannot be reduced to a formula. Rather, it requires that courts "exercise reasoned judgment identifying interests of the person so fundamental that the State must accord them its respect." *Obergefell*, 576 U.S. at 664 (quoting *Poe v. Ullman,* 367 U.S. 497, 542 (1961)).

If the right is found to be fundamental, the Court must strictly scrutinize state infringement, ensuring that the state action is narrowly tailored to serve its compelling interests that outweigh the infringement. *Id.* at 663. The rights at issue here are all fundamental and, thus their infringement triggers strict scrutiny. Defendant's proposed substantive due process analysis does not apply to fundamental rights and is not applicable to the questions posed by this case.

    **a.  The right to a medical exemption where a child may be at risk of harm is a fundamental right and requires strict scrutiny**

The right to a medical exemption is itself an independent fundamental constitutional right requiring strict scrutiny analysis. This has been recognized by the Supreme Court for over 115 years. *Jacobson v. Commonwealth of Massachusetts*, 197 U.S. 11, 27, 36-39 (1905)(holding that the police powers of a state are broad enough to impose vaccine mandates to protect the community at large within limits, but independent non-deferential judicial review is necessary if a person is vulnerable to harm from the mandated vaccine).

Defendants propose that *Jacobson* is like a magic wand – say the words "public health" or "vaccine" and all judicial scrutiny should magically disappear. This is not the legal standard. *Jacobson* itself directly refutes this approach. In *Jacobson*, the Supreme Court held that while great deference should be given to community level cost-benefit analysis, no such deference should be given in cases where an individual may be at risk of harm from a vaccine. The Court expressly warned that Judges must not abandon rigorous independent judicial scrutiny of medical exemption claims. *Id.* Indeed, the Court stated that mandating a person submit to a vaccine that may cause harm to them is not only unconstitutional but "cruel and inhuman in the last degree":

> Before closing this opinion we deem it appropriate, in order to prevent misapprehension as to our views, to observe—perhaps to repeat a thought already sufficiently expressed, namely—that the police power of a state, whether exercised directly by the legislature, or by a local body acting under its authority, may be exerted in such circumstances, or by regulations so arbitrary and oppressive in particular cases, as to justify the interference of the courts to prevent wrong and oppression. Extreme cases can be readily suggested. Ordinarily such cases are not safe guides in the administration of the law. **It is easy, for instance, to suppose the case of an adult[2] who is embraced by the mere words of the act, but yet to subject whom to vaccination in a particular**

---

[2] "There being obvious reasons for such exception", children were exempt from the smallpox mandate. "*Jacobson v. Commonwealth of Massachusetts*, 197 U.S. 11, 30 (1905)("there are obviously reasons why regulations may be appropriate for adults which could not be safely applied to persons of tender years").

21

**condition of his health or body would be cruel and inhuman in the last degree.**" *Id* at 38–39 (emphasis added).

The *Jacobson* Court clarified that where a person alleges they are "*not at the time a fit subject of vaccination, or [for whom] vaccination by reason of his then condition would seriously impair his health*," the Judiciary is not only competent to strictly review the appropriate tailoring of the medical exemption, but <u>must do so</u>:

> We are not to be understood as holding that… the judiciary would not be **competent to interfere and protect the health and life of the individual concerned**. *Id.* (emphasis added)

Public health law scholars acknowledge this principle of harm avoidance as part of the foundational holding of *Jacobson. See, e.g.*, LAWRENCE O. GOSTIN, PUBLIC HEALTH LAW: POWER, DUTY, RESTRAINT 126-28 (2d ed.2008)(per *Jacobson,* public health regulations require five elements to be constitutional: (1) public health necessity, (2) reasonable means, (3) proportionality, (4) harm avoidance, and (5) fairness).

It is not surprising that *Jacobson* held the Court must strictly review medical exemption claims without deference even though it was decided decades before modern notions of fundamental categories of liberty rights and tiers of scrutiny emerged in the judiciary. Medical exemptions do implicate liberty rights, but at the heart of it they are about the right to life itself. As the *Jacobson* Court stated a hundred and fifteen years ago, mandating that a person submit to an otherwise permissible vaccine law if it could put them at risk of harm or death is cruel and inhuman in the last degree and a clear violation of the Constitution's inalienable protection of the right to life. *Jacobson* 197 U.S. 11 at 39.

Defendants reliance on cases from the religious exemption context are inapposite as *Jacobson* did not articulate a clear carve out for religious beliefs, or really any fundamental liberty rights, other than through general principals cautioning certain situations where the Court

22

must intervene to prevent wrong and oppression. The only specifically enumerated carve-out in *Jacobson* is for medical exemptions. Self-defense needs of the state may or may not outweigh religious rights, but they certainly cannot take precedence over an individual's right to defend their own life or health under the express holding of *Jacobson.*

The Supreme Court continues to recognize a sufficient medical exemption as an independent fundamental right that is strictly scrutinized to a standard far surpassing the other articulated fundamental rights.

In *Planned Parenthood of Southern PA v. Casey,* for example, the Supreme Court affirmed that a woman has a constitutionally protected right to an abortion. 505 U.S. 833 (1992). However, like most other constitutionally protected liberty rights, that right is not unlimited; the state's compelling interest in the protection of the unborn child allows a state to prohibit abortion after viability as the state's compelling needs have been determined to outweigh the abortion right at that point. Moreover, even pre-viability, various laws regulating medicine or society can be applied which infringe on the right to a pre-viability abortion so long as they do not provide an "undue burden" on a substantial percent of effected women attempting to exercise their pre-viability abortion right. *Id.*

However, otherwise permissible infringements on the right to an abortion must have a sufficient medical exemption to be constitutionally valid, even post-viability regulations which are narrowly tailored to serve recognized compelling state interests. *Id. Casey* affirmed that the right to a medical exemption from an otherwise permissible state infringement is a separate right from the right to an abortion, and cannot be infringed in the same way, no matter how compelling the state interests might be.

*Casey* and subsequent cases defining the medical exemption that come after it are directly applicable here. Just as there is a well-settled constitutionally protected right to an abortion, it is

well-settled that we have a constitutionally right to refuse medical treatment. *Cruzan v. Director, Mo. Dept. of Health,* 497 U.S. 261, 278 (1990). However, in cases of public health necessity as a matter of community self-defense, the state, pursuant to *Jacobson,* may be able to compel us to take vaccines that can protect the community from harm, even if we philosophically disagree that they are the best approach and even if we wish to refuse them for non-medical reasons. And, in defense of the unborn fetus, the state may prevent a woman from getting an abortion after viability, even if she disagrees philosophically and even if she does not wish to carry a child in her body any longer. In both circumstances, however, a bright line is drawn where a person's health or life may be at stake. As the case law makes clear, no state interest, no matter how compelling, can override our individual right to protect ourselves by opting out of a law if our life or health would be endangered by it. This right to a medical exemption is a separate and far more powerful right than any of the liberty interests related to it. *See, e.g., Ayotte v. Planned Parenthood of N. New England,* 546 U.S. 320, 325 (2006)(recognizing that the right to a medical exemption as absolute and any otherwise permissible regulation on abortion must be modified or vacated if it could exclude a person from the right to a medical exemption in cases where their health may be at risk).

> **b. The regulations and policies at issue place an undue burden on the fundamental right to a medical exemption for vulnerable children**

The question then becomes – how is it determined whether the life or health of a person might be sufficiently endangered to trigger their right to a medical exemption? Who gets to decide? Two clear lines have emerged in the case law involving medical exemptions: harm avoidance, and a bar against infringement on the chosen licensed provider's "best medical judgment." The challenged regulations and policies violate both. It is well settled law that as long as a physician licensed in the state certifies a patient may be at risk of harm, that is enough

and their determination must be able to rest on any factor that they determine in their clinical judgment to be relevant without burdensome review or threat of reversal.

### *Infringement on Chosen Physician's Good Faith Medical Judgment*

Fifty years ago, in *Doe v. Bolton,* decided concurrently with *Roe v. Wade,* the Supreme Court examined medical exemption infringements very similar to the ones at issue in this case and squarely held them unconstitutional. 410 U.S. 179, 199-200 (1973).

First, the Court held that physicians must be able to consider a broad range of factors relevant to their clinical determination about whether a medical exemption is "necessary." "*We agree with the District Court that the medical judgment may be exercised in the light of all factors—physical, emotional, psychological, familial, and the woman's age—relevant to the well-being of the patient. All these factors may relate to health. This allows the attending physician the room he needs to make his best medical judgment*." The Supreme Court recently affirmed the same principle in *Stenberg v. Carhart* 530 U.S. 914, 937 (2000):

> Medical treatments and procedures are often considered appropriate (or inappropriate) in light of estimated comparative health risks (and health benefits) in particular cases. Neither can that phrase require unanimity of medical opinion. Doctors often differ in their estimation of comparative health risks and appropriate treatment.

Thus, the Supreme Court clarifies that a physician's determination of what may cause harm needs to rest on any factor the physician finds relevant to a woman's health in her clinical judgment and differences of medical opinion cannot be the basis for denying a physician's recommendation. Under this standard, the challenged requirement that a physician limit her determination of "what might be detrimental to a child's health" to the narrow ACIP guidelines alone would surely be unconstitutional.

Second, the Supreme Court held it is unconstitutional to allow a hospital committee to review the treating doctor's determination of medical necessity before allowing the abortion to

occur at that hospital. *Id.* at 199-200. The Court discussed at length why a hospital, which has an independent interest in ensuring that it is complying with law and standards of care, would want to review the grounds of the medical exemption. Nonetheless, the Court held that such review violated the patient's constitutional rights:

> Saying all this, however, does not settle the issue of the constitutional propriety of the committee requirement. Viewing the Georgia statute as a whole, we see no constitutionally justifiable pertinence in the structure for the advance approval by the abortion committee…**The woman's right to receive medical care in accordance with her licensed physician's best judgment and the physician's right to administer it are substantially limited by this statutorily imposed overview**." *Id.* at 192. "**We conclude that the interposition of the hospital abortion committee is unduly restrictive of the patient's rights and needs that, at this point, have already been medically delineated and substantiated by her personal physician.** To ask more serves neither the hospital nor the State. *Id.* at 197. *Emphasis added.*

For the same reasons the Court found it unlawful for the hospital committee to subject medical exemptions to review before a patient is admitted, schools cannot subject medical exemptions to review before a student is admitted. A woman might not have a right to have an abortion at a particular hospital, a student might not have a right to an education. However, no school or hospital has the right to substantively review and deny a person's chosen physician's medical determination regarding their qualification for a medical exemption. That is between a patient and their doctor, so long as that doctor is licensed in the state.

Lastly, the Court held that it was unconstitutional to require corroborating opinions from other state-licensed physicians. The Court's discussion of corroborating opinions is particularly apposite to this case:

> The reasons for the presence of the confirmation step in the statute are perhaps apparent, but they are insufficient to withstand constitutional challenge. Again, no other voluntary medical or surgical procedure for which Georgia requires confirmation by two other physicians has been cited to us. **If a physician is licensed by the State, he is recognized by the State as capable of exercising acceptable clinical judgment**. If he fails in this, professional censure and deprivation of his license are available remedies. Required acquiescence by co-practitioners has no rational connection with a patient's needs and unduly infringes on the physician's right to practice. The attending physician will know when a consultation is advisable—the doubtful situation, the need for

assurance when the medical decision is a delicate one, and the like. Physicians have followed this routine historically and know its usefulness and benefit for all concerned. **It is still true today that '(r)eliance must be placed upon the assurance given by his license, issued by an authority competent to judge in that respect, that he (the physician) possesses the requisite qualifications.'**

Under this standard, Defendants' arguments must fail. They cannot justify the denials based on a lack of corroborating opinion from the consultants that they hire or the failure of a family to seek and obtain various corroborating opinions from specialists. *Doe* clarified that corroborating opinions (or lack thereof) cannot be required for a medical exemption.

In this case, by enacting Public Health Law §2164(8), the New York State legislature reached the limit of permissible restriction on medical exemptions. Under *Doe*, the fact that a physician licensed to practice in New York must certify the exemption is not merely sufficient; further regulation is unconstitutional. "If a physician is licensed by the State, he is recognized by the State as capable of exercising acceptable clinical judgment." *Doe* 410 U.S. at 200.

Arguments that these cases don't apply outside of the abortion context contradict the Supreme Court itself. The Supreme Court reaffirmed *Doe* outside of the abortion context in *Whalen v. Roe,* 429 U.S. 589, 603 (1977)(under *Doe* it would be impermissible if access to controlled medications were "conditioned on the consent of any state official or third party" beyond the chosen licensed provider). Courts continue to affirm *Doe's* holding. *See, e.g., Matter of Hofbauer,* 47 N.Y.2d 648, 655–56, (1979)(citing *Doe* in denying a neglect proceeding against parents who chose to forego chemotherapy and holding that a parent must be able to follow any course of treatment "which is recommended by their physician and which has not been totally rejected by all responsible medical authority.")

Nor does the "public health" angle refute any of these protections. Medical exemptions are a clear carve out in *Jacobson,* as discussed above, and public health needs do not change that. A recent case from the Eleventh Circuit affirmed that it is unconstitutional for a state to even

suggest it might remove discretion from the treating physician in determinations about the need for a medical exemption despite the state's reliance on a public health emergency. *Robinson v. Attorney General* 957 F.3d 1171 (11th Cir. 2020)(upholding a TRO staying emergency regulations restricting elective medical procedures due to *Covid-19*). In *Robinson,* conflicting directives were given about whether providers or the state would have "final say" over what qualified for a medical exemption under the state's emergency regulations banning elective procedures during the height of the outbreak. The court deemed unconstitutional the mere possibility that a treating provider could be overruled in the determination of medical necessity, even though defendants argued that it was unlikely that the state would ever choose to overrule a treating physician's medical determination of necessity and despite the state's argument that the law was necessary and should receive discretion due to the devastating worldwide pandemic. *Id.* at 1180.

### *Harm Avoidance*

Secondly, the Supreme Court has repeatedly held that if a medical exemption is narrow enough to even hypothetically exclude anyone who might need it to prevent harm, it is unconstitutional on its face. *Ayotte* 546 U.S. at 320, 325-27 (any regulation that could result in denial of a medical exemption to even "some very small percentage" of cases is unconstitutional whether challenged facially or as applied).

These cases illustrate how much stricter the scrutiny is over medical exemptions than other fundamental rights, such as abortion. A plaintiff alleging a facial challenge to an otherwise permissible abortion regulation has to establish that "in a large fraction of cases in which [the law] is relevant, it will operate as a substantial obstacle to a woman's choice to undergo an abortion." *Casey,* 505 U.S. at 895. However, in analyzing a facial challenge to a *medical exemption,* the Supreme Court held that even where the risk of harm could only occur in "some

very small percentage" of cases that were not covered by the existing exemption, the law was too narrow and therefore unconstitutional. *Ayotte,* 546 U.S. at 328.

In *Stenberg* the Supreme Court held that the hypothetical possibility that a woman would not be covered by a statute's narrow medical exemption rendered the law unconstitutional. 530 U.S. at 937. The case involved a partial birth abortion ban. Though there were many other abortion methods a woman could exercise if her health were in danger, the Court held that the possibility that the partial-birth abortion could be the preferable method and some women may be excluded from exercising it was enough to render the law unconstitutional on its face. The Court's analysis about whether any woman could actually be at risk of harm if they didn't meet the narrow medical exemption in the ban, and what evidence was necessary to establish that the exemption was too narrow, is instructive:

> The word "necessary" in *Casey's* phrase "necessary, in appropriate medical judgment, for the preservation of the life or health of the mother," …cannot refer to an absolute necessity or to absolute proof…*Casey's* words **"appropriate medical judgment" must embody the judicial need to tolerate responsible differences of medical opinion."** *Id.* at 937. (emphasis added)

In *Ayotte*, the Supreme Court addressed another facial challenge to an abortion regulation's medical exemption and also struck it down as too narrow. *Ayotte* 546 U.S. The challenged law required that a provider notify a minor's parents 48 hours before performing an abortion on a woman under 18. The Court acknowledged that protecting the parents' fundamental right to such notification was a compelling state interest and the substantive law was valid. The issue was whether the medical exemption, which provided an exception to the waiting period in cases where the minor's life was endangered, was too narrow to survive constitutional scrutiny. The Supreme Court held that it was unconstitutional, as the state acknowledged that "in some very small percentage of cases" a young woman's health but not life might be endangered by waiting 48 hours to perform an abortion. In so holding, the Court

affirmed that any medical exemption provision which was narrow enough to exclude even a "very few" is facially unconstitutional, even in the face of compelling government purposes. *Ayotte,* 546 U.S. Moreover, the Court held that requiring a doctor certify with such "impossible specificity" whether the harm was severe enough to cause death versus a health risk would unconstitutionally subordinate the doctor's exercise of their good faith medical judgment free from restraint. The case was remanded to determine if any portion of the law outside of the unconstitutionally narrow medical exemption could be saved by declaratory or injunctive relief or severance.

In the cases above, even the hypothetical possibility of harm was enough to render a medical exemption unconstitutional. In this case, the medical exemption cannot survive where the risk of harm is present, clear, and serious, as illustrated by many specific examples certified by licensed physicians of the named plaintiffs. These risks are not hypothetical but well-established. The complaint and moving papers list hundreds of additional evidence-based reasons that exist beyond the narrow ACIP guideposts which put some children at risk of serious harm and even death.

Guidelines are not meant to ever replace a treating physicians' clinical judgment or serve as an exhaustive list of contraindications and precautions. Even the CDC ACIP representative who authored the current guidelines acknowledged to plaintiff Jane Doe in writing that the ACIP guidelines cannot serve to define the limits of a valid medical exemption, and that the treating physician must be able to determine if there are additional reasons for exemption in a particular case based on their clinical judgment. *See* Dkt 1 (complaint) ¶268.

The complaint lists hundreds of additional evidence-based reasons that exist beyond the narrow ACIP guideposts that could put some children at substantial risk of harm or death which

are acknowledged by manufacturers, the United States Government, and the Institutes of Medicine, among others.  In short, Defendants' limiting definition is irrational and reckless.

Some of these named plaintiff children already suffered one or more serious known adverse reactions to immunization; licensed medical professionals have documented them. Some of these families have lost one or more child to death caused by adverse reactions to vaccines. Some of these children have produced corroborating certifications from multiple licensed physicians and even multiple *specialists* that they are at risk of serious harm from one or more mandatory vaccines and still are denied a medical exemption. Such denials put these children at unacceptable risk of injury and even death.

The harm avoidance principle is unwavering. Though a state actor may have compelling reasons to limit medically unnecessary abortions to protect viable fetuses, or to limit medically unnecessary exemptions to protect the community from contagion, the Supreme Court has repeatedly clarified that forcing a person to submit to risk of serious personal harm is not an acceptable casualty in service of those needs.[3]

If the Supreme Court in *Stenberg* and *Ayotte* struck regulations that *might* cause risk of harm in hypothetical cases, despite the presence of compelling state interests, certainly Plaintiffs here, with proven records of actual harm in addition to verified risk, should prevail.  On this ground alone, the Court should deny Defendants' motion to dismiss.

---

[3] The inclusion of the possibility of using "other nationally recognized evidence-based standards of care" does not save the regulation from constitutional insufficiency. As the evidence will show at trial, and as the plaintiffs have clarified in their complaint, both the state defendants and the individual school district defendants have ignored any expansion that may offer such that children who are at risk of harm are routinely denied medical exemptions.

### c. The challenged policies and procedures are not narrowly tailored to uphold a compelling state interest sufficient to outweigh the plaintiffs' right to a medical exemption

The risks to children here are the more unconscionable because Defendants cannot justify the restrictions as necessary to achieving any compelling state interest. Taking the Plaintiffs' factual allegations as true and affording them all reasonable inferences, the Defendants' purpose cannot even survive a rational basis review, let alone the higher bar of strict scrutiny that medical exemption cases require.

Defendants admit explicitly and implicitly that the goal of their onerous and humiliating policies and procedures is to burden the medical exemption process and limit the number given. But limiting the number of children who can obtain a medical exemption at the potential expense of their health is not a constitutional purpose. Here, Defendants pursue their goal by arbitrarily exposing deserving children to harm or expelling them. Defendants thereby defeat the state's compelling interest to protect life and instead cause irreparable harm.

To the extent that Defendants assert the need to protect the community from contagious disease, the challenged policies, regulations, and procedures are not narrowly tailored to that end or even substantially related. While inquiry into the state's reasoning behind adopting vaccine laws may not be necessary when assessing the state's choice to impose a vaccine mandate, the courts must exercise independent judicial review of the state's need to limit a medical exemption.

There was no medical emergency at the time these policies were adopted – rather, the defendant's own documentary submissions show that when the new regulations were enacted, the "epidemic" of measles had been declared over and there were no measles cases in New York. Medical exemptions played no part in the outbreak of 2019 nor could they. The defendants assert that herd immunity needs to be at 84-95% for measles community immunity. The less than 0.01 percent of children whose doctors are willing to write medical exemptions from vaccines could

not impact these numbers even if their number tripled as defendants allege happened in California after the repeal of the philosophical exemption. Moreover, defendants do not even attempt to justify forcing children to get vaccines that can't create herd immunity against medical advice, or barring children from online education or socially distanced education on the grounds of a public health need. The challenged policies bear no real and substantial relation to legitimate public health needs.

Invoking "public health" does not end the inquiry, even where *Jacobson* deference is properly invoked. Rather, as the Chief Judge of the Northern District of New York held: "*Courts must consider whether the government's challenged action lacks a real or substantial relation to public health…when determining whether the action reasonably and permissible restricts constitutional rights to combat a public health emergency.*" *DiMartile v. Cuomo*, No. 120CV0859GTSCFH, 2020 WL 4558711 (N.D.N.Y. Aug. 7, 2020)(finding the government reasoning lacked a real and substantial relationship to mitigating *Covid-19* and granting a preliminary injunction against emergency *Covid-19* regulation restricting weddings to 50 guests); *see also Soos v. Cuomo*, No. 120CV651GLSDJS, 2020 WL 3488742, at *8 (N.D.N.Y. June 26, 2020)(granting preliminary injunction against emergency *Covid-19* regulation restricting number of church participants in live attendance).

As *Jacobson* itself made clear, courts can and must ensure that the state's need is real and urgent, and the means tailored to avoid overbroad infringement of rights before affording deference, even in a recognized public health emergency. "*As the Chief Justice recognized in Newsom, it is not the judiciary's role to second guess the likes of Governor Cuomo or Mayor de Blasio when it comes to decisions they make in such troubling times, that is, until those decisions result in the curtailment of fundamental rights without compelling justification*" *Soos v. Cuomo*, No. 120CV651GLSDJS, 2020 WL 3488742, at *8 (N.D.N.Y. June 26, 2020).

But here, *Jacobson* deference can't even be invoked. As discussed above, *Jacobson* itself expressly holds deference doesn't apply to medical exemption review.

### d.  The state cannot substitute its judgment for the judgment of fit parents

Neither can the defendants assert that their compelling interest in burdening medical exemptions is to protect individual children from wrong decisions by their licensed providers. Parents have a fundamental right to direct the care and upbringing of their children, and medical decisions fall squarely within that liberty interest. *See Troxel v. Granville*, 530 U.S. 57, 58 (2000)("There is a presumption that fit parents act in their children's best interests" and thus "there is normally no reason for the State to inject itself into the private realm of the family to further question fit parents' ability to make the best decisions regarding their children."); *see also Parham v. J.R.*, 442 U.S. 584, 604 (1979)("Simply because the decision of the parent…involves risks does not automatically transfer the power to make that decision from the parents to some agency or officer of the state. The same characterizations can be made for a tonsillectomy, appendectomy, or other medical procedure…Parents can and must make those judgments.")

It is constitutionally impermissible for defendants to usurp these decisions because of a disagreement between the treating physician and the school district consultant, a person who has never examined the child and  who is thus inherently less qualified to make critical health decisions. Such a regime is also against the child's best interest.  Advised by their physicians, parents are in the best position to determine a course of action where there are differing medical opinions to protect their medically fragile child's health.

These rights adhere not only to the parent but to the child as well. "The right to family association includes the right of parents to make important medical decisions for their children,

34

and of children to have those decisions made by their parents rather than the state." *Wallis v. Spencer*, 202 F.3d 1126, 1141 (9th Cir. 2000).

"While this right is not absolute inasmuch as the State, as *parens patriae*, may intervene to ensure that a child's health or welfare is not being seriously jeopardized by a parent's fault or omission, great deference must be accorded a parent's choice as to the mode of medical treatment to be undertaken and the physician selected to administer the same." *Matter of Hofbauer,* 47 N.Y.2d 648, 655–56, (1979)(a parent and child's constitutional rights demand parents be able to make medical treatment decisions in cases where there is a conflict of medical opinion, so long as the parent has sought the advice of licensed professionals and follows a plan "which is recommended by their physician and which has not been totally rejected by all responsible medical authority.")

### e. Unconstitutional Conditions Doctrine bars defendants from claiming that they are excused from strict scrutiny

Defendants attempt to get around the violations these and other fundamental rights by stating that there is no right to school, and so they may freely exclude any child or whole categories of children from school without meaningful judicial review. This ignores the unconstitutional conditions doctrine.

Whether or not the state has a responsibility to provide a public education to the children of the state is irrelevant to this case. The unconstitutional conditions doctrine has long held that the government cannot condition receipt of a benefit on the waiver of constitutional protections. *"[E]ven though a person has no "right" to a valuable governmental benefit and even though the government may deny him the benefit for any number of reasons, there are some reasons upon which the government may not rely. It may not deny a benefit to a person on a basis that infringes his constitutionally protected interests...."* *Perry v. Sinderman*, 408 U.S.

593, 597 (1972).

The unconstitutional conditions doctrine "*vindicates the Constitution's enumerated rights by preventing the government from coercing people into giving them up.*" *Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595, 604 (2013). The simplest statement of the doctrine is that in conditioning the receipt of a government benefit, the government must not be allowed to do indirectly what it cannot do directly. For further discussion of this doctrine *see generally* Lynn A. Baker, The Prices of Rights: Toward a Positive Theoy of Unconstitutional Conditions, 75 CORNELL L Rev. 1185, 1189 (1990); Albert J. Rosenthal, Conditional Federal Spending and the Constitution, 39 STAN. L. REv. 1103, 1114 (1987); Kathleen M. Sullivan, Unconstitutional Conditions, 102 HARV. L. REV. 1413, 1421-22 Q989).

If the government is unable to demand that parents vaccinate their children against the advice of licensed physicians who have certified that they are at risk of harm or death from the vaccine generally, their employees and assigns are unable to condition receipt of a benefit such as the right to attend any public or private school on waiver of constitutional shields against such action. "*A predicate for any unconstitutional conditions claim is that the government could not have constitutionally ordered the person asserting the claim to do what it attempted to pressure the person into doing.*" *Rumsfeld v. Forum for Academic and Institutional Rights, Inc.*, 547 U.S. 47, 59-60 (2006). This is well recognized in the Second Circuit, which applies the unconstitutional conditions even more broadly to include express protection for entirely discretionary benefits. *See, e.g., All. for Open Soc'y Int'l, Inc. v. U.S. Agency for Int'l Dev.*, 651 F.3d 218 (2d Cir. 2011), aff'd sub nom. *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205 (2013)(granting injunctive relief to NGO's that took issue with grant requirement that they express disapproval of prostitution to be eligible for a discretionary grant).

As discussed throughout this brief, the challenged policies violate a number of

36

fundamental rights and cannot be dismissed by the claim that the state can coerce otherwise unconstitutional behavior by conditioning the right to attend any public or private school on the acceptance of the constitutional violation. Just as a school would be barred from excluding girls from an education if they have exercised their right to an abortion, the schools cannot exclude medically fragile children because they have exercised their right to a medical exemption from immunization based on the certification of their licensed physician.

It is respectfully submitted that the Court's distinction between medical exemptions in the abortion context and the school immunization context is not sufficient to withstand this doctrine. While it is true that the state is not holding children down and forcibly injecting them against medical advice, the denial of the right to attend any public or private school in the state is a cruel and crippling burden on these families and children. Similarly, denying a woman the right to be exempt from otherwise permissible state regulations that impact abortions may not prevent a woman from getting a necessary abortion – she could go to another state, she could attend another hospital, or she could utilize another method of abortion that is not banned. However, the Court has consistently held that placing such burdens on medical exemptions are not constitutional.

### III.   POINT THREE: THE REHABILITATION CLAIMS ARE FACIALLY SUFFICIENT TO WITHSTAND DISMISSAL

Plaintiffs sufficiently pleaded viable claims under the Rehabilitation Act and have established that their equal protection rights have been violated.

Pursuant to *Brown v. Board of Education,* though a state may not be required to provide a public education system, once they have elected to provide one, they are constitutionally strictly prohibited from withholding it based on any protected status. *Brown v. Bd. of Ed. of*

*Topeka, Shawnee Cty., Kan.,* 347 U.S. 483 (1954*), supplemented sub nom. Brown v. Bd. of Educ. of Topeka, Kan.*, 349 U.S. 294 (1955*)*.

> Today, education is perhaps the most important function of state and local governments. Compulsory school attendance laws and the great expenditures for education both demonstrate our recognition of the importance of education to our democratic society. It is required in the performance of our most basic public responsibilities, even service in the armed forces. It is the very foundation of good citizenship. Today it is a principal instrument in awakening the child to cultural values, in preparing him for later professional training, and in helping him to adjust normally to his environment. In these days, it is doubtful that any child may reasonably be expected to succeed in life if he is denied the opportunity of an education. **Such an opportunity, where the state has undertaken to provide it, is a right which must be made available to all on equal terms**. *Id.* (emphasis added).

Section 504 of the Rehabilitation Act of 1973 provides this protected status to disabled children and strictly prohibits schools that receive federal financial assistance from discriminating on the basis of disability with respect to admission to or participation in their programs and activities. 34 C.F.R. §§ 104.42 and 104.43; 45 C.F.R. §§ 84.42 and 84.43. In addition, schools are prohibited from using criteria or methods of administration that have the effect of discriminating or tend to screen out an individual with a disability, or any class of people with disabilities. 42 U.S.C. § 12182(b)(1)(DD); 28 C.F.R. § 35.130(b)(3); 34 C.F.R. § 104.4(b)(4); 45 C.F.R § 84.4(b)(4). The ADA and Section 504 also require covered entities to make reasonable modifications to their policies, practices, or procedures when necessary to avoid discrimination on the basis of disability, unless such modifications would fundamentally alter the nature of the program or the services provided. 28 C.F.R. § 36.302; 28 C.F.R. § 35.130(b)(7); 34 C.F.R. § 104.44(a); 45 C.F.R. § 84.44(a).

"To establish a prima facie case of discrimination under either the ADA or Section 504, a plaintiff must show the following: (1) plaintiff is a "qualified individual with a disability;" (2) plaintiff was "excluded from participation in a public entity's services, programs or activities or

was otherwise discriminated against by [the] public entity;" an (3) "such exclusion or discrimination was due to [plaintiff's] disability. *B.C. v. Mount Vernon School,* 837 F.3d 152, 158 (2d Cir. 2016)(citations omitted). In connection with the second prong: "(e)xclusion or discrimination may take the form of disparate treatment, disparate impact, or failure to make a reasonable accommodation." *Id*.

Plaintiffs allege that due to their disabilities, which prevent them from being able to be safely immunized per the certification of their licensed physicians, defendant districts have excluded them from participation in services that they are otherwise entitled to receive. Moreover, they have been discriminated against on the basis of disparate treatment, disparate impact and failure to make a reasonable accommodation and denied their equal protection rights.

Defendants argue that the Plaintiffs cannot prevail because they cannot show that they are excluded from participation in benefits due to their disabilities. Defendants misapply *D.A.B. v. N.Y.C. Dept of Educ.*, 45 F. Supp.3d 400 (S.D.N.Y. 2014) for the proposition that vaccination requirements cannot constitute discrimination based on disability. However, *D.A.B.* actually supports plaintiffs in this case.

The court in *D.A.B.* specifically relied upon the availability of a sufficient medical exemption to conclude that the challenged regime would not likely be deemed discriminatory. The plaintiff in D.A.B. suggested as an ancillary argument to why placement at a public school would be inappropriate for him, that the school's compulsory vaccination requirements violated Section 504. In dicta, the court speculated that the vaccine requirement was unlikely to be found discriminatory, as there was a medical exemption available if the child could not safely take the vaccine because of his medical disability. *D.A.B.,* 45 F. Supp. 3d at 407. The child in D.A.B. never presented a certification from a physician that he was unable to get a vaccine due to

medical reasons. If he had at the time (before the new arbitrary regulations were imposed) he would have been able to get a medical exemption.

Here, plaintiffs allege that the new regulations and the policies and practices of individual school districts narrow medical exemption criteria so much that most acknowledged harms and conditions are no longer covered, thereby depriving whole categories of disabled children from receiving their needed medical exemption.

Thus, those children with disabilities that fall outside of the non-exhaustive ACIP contraindications are discriminated against and denied benefits to which they are otherwise entitled. Plaintiffs have made a *prima facie* case that the restrictions are overly narrow and plausibly unlawful. These policies are discriminatory and disparately impact medically fragile children with disabilities that fall outside of the narrow list of ACIP contraindications and precautions.

Defendants next question whether the children are disabled. Section 504 of the Rehabilitation Act defines "disability" as any physical or mental impairment that "substantially limits one or more major life activities" including the functioning of the immune system. Individuals with a history of their specific impairment or who are regarded as having an impairment will also be extended protection. Each child here has multiple significant impairments documented by their licensed physicians. All of them suffer from immune dysfunctions that prevent them from being immunized with one or more of the required childhood vaccines.

Absent a showing that they pose a direct threat[4] to their classmates, which must be reviewed under an exacting standard, the children must be accommodated.  Any such determination has to be made after a fact finding and requires judicial scrutiny.

## IV.   POINT FOUR: PLAINTIFFS ADEQUATELY PLED MUNICIPAL LIABILITY

Defendants argue that even if plaintiffs have properly alleged that their federal or constitutional rights were violated, they have not established there was an "official policy" alleged that could lead to municipal liability for any of the constitutional violations.

Plaintiffs may demonstrate an official policy under four different paths: (1) alleging a formal policy officially endorsed by the municipality; (2) alleging actions taken by policy makers with authority to establish the municipal policies that caused the particular deprivation in question; (3) alleging a practice so consistent and widespread that, although not expressly authorized, constitutes a custom or usage of which a supervising policy-maker must have been aware; (4) alleging a failure by policy makers to provide adequate training or supervision to subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with municipal employees. *Benacquista v. Spratt,* 217 F.Supp.3d 588, 599-600 (N.D.N.Y. 2016).

Plaintiffs allege and defendants appear to acknowledge that each of the defendant school districts officially adopted the policies and practices which they challenge as unconstitutional.

---

[4] In determining whether an individual poses a direct threat, objective evidence must be reviewed in order to overcome the potential for prejudice. Courts have denied claims that children who are infected with hepatitis b, for example, pose an actual danger to their classmates sufficient to exclude them from school (though under the current challenged scheme, a child who does not have hepatitis b but is unable to take the hepatitis b vaccine would be excluded if their reason didn't fall under ACIP's narrow criteria).

The Lansing Central School District elected to subject the Coe children's medical exemptions to review through consultations with the DOH, and then officially decided that the school principals should make the determination independently from the DOH recommendation. They officially decided not to provide any detail as to the basis of the determination to the family or offer any accommodation to provide additional information. This was affirmed in a letter from counsel.

The Coxsackie-Athens School District elected to subject John Doe's exemption to substantive review and to allow their consultant, who has never met John Doe, to overrule two of his licensed physician's. They were aware that their consultant had narrowed the grounds on which a medical exemption would be upheld to exclude anything but a narrow reading of the ACIP guidelines because they were copied on the letters and adopted the advice and basis for advice after review. They were unwilling to allow the family or the treating physician to provide any follow up supporting materials or calls or to provide any reason for the second denial other than to say that though it met the ACIP guideline criteria it was "unsupported."

The Penfield Central School District elected a policy to allow their doctor, a sports medicine doctor who admitted that he would not even consider medical exemptions other than from two specialists in the state, to reject medical exemptions on arbitrary criteria far outside the boundaries of ACIP. Superintendent Putnam was aware of and signed off on Dr. Tuite's bizarre emails regarding the narrow list of who he might "trust."

Defendants next claim that to the extent that the policies that they adopted are found unconstitutional, that they were merely following the law and cannot be liable. They point out that in order for municipalities to be liable under *Monell*, there must have been a "conscious choice" in adopting the policy at issue. *Vives v. City of New York*, 524 F.3d 346, 353-354 (2d. Cir. 2008).

These schools had choice and they exercised it. School districts are not obligated under the new regulations or any other law to engage in substantive review of medical exemption determinations. The named school districts here made a "conscious choice" to adopt discretionary policies to review and burden the medical exemption in the specific manner detailed at length in the complaint and challenged as unconstitutional.

Public Health Law §2164(8) specifically provides that as long as any physician licensed in the state has certified a child may be at risk of harm, the requirements for principals and schools pursuant to §2164(7) along with all other requirements in any subsection of §2164 shall not apply. The regulations specifically state that a school *may* request additional information but as the Commissioner held in plaintiff Doe's appeal, this is discretionary – the regulations do not require schools to do so. 10 NYCRR §66-1.3.

Plaintiffs are prepared to prove their allegations that schools are not required to engage in any substantive review at all. The DOH routinely stresses this point and there are recordings with DOH counsel, correspondence with schools and other evidence which make the limits of the schools' obligation clear. So long as a school ensures the exemption is on the correct form, that it specifies which vaccines the child is exempt from and that it is from a licensed New York physician, that is the limit of the school's responsibility under the regulations. To the extent that the individual school districts disagree, this is a factual determination and all questions of fact must be resolved in the plaintiffs' favor at this stage.

Defendants next allege that no school district or their agent or assign can be considered a final decision-maker or final policy-maker for purposes of defining municipal liability. This is also a contested fact that is easily provable and must be resolved at this stage in plaintiffs' favor. As the complaint details, sole authority to accept or reject a medical exemption lies with the school principal or person in charge of the school. As the complaint states, DOH letters

routinely note that any recommendation they make when asked to consult are not binding, and the principal has final decision-making authority. In the case of the Coe children, the Lansing Central School District specifically asserted that they were not relying on any advice from the DOH, but rather had deferred to the building principals as final decision-makers who made the decision "independently" on unspecified grounds. Moreover, it is well-settled law that Superintendents are final policy makers. The Superintendents in these cases wrote the final determination letters and were intimately involved in every step of the challenged conduct. Defendants cite no authority for their proposition that the availability of court proceedings or appeals to the Commissioner of Education (who does not review the decision to deny *de novo* or offer an opportunity for a hearing) somehow absolves the district officials of any responsibility or status as decision makers. This standard would eviscerate any municipal liability.

Plaintiffs articulated specific and detailed challenged conduct against each defendant named, which amply meet the pleading requirements to establish municipal liability, and these detailed allegations are specifically incorporated into each of the causes of action.

## V.      EXHAUSTION IS NOT REQUIRED

It is beyond debate that exhaustion is not required in §1983 cases of this nature. *Patsy v. Bd. of Regents of State of Fla.,* 457 U.S. 496, 500 (1982)(Federal claims premised on § 1983 do not require exhaustion of state judicial or administrative remedies, in recognition of the paramount role Congress has assigned to the federal courts in protecting constitutional rights.)

Defendants' misapply their arguments for exhaustion. They assert that this Court should bar the suit because some members of the putative class have not availed themselves of Article 78 actions or appealed to the Commissioner of Education (though some, including *Jane Doe*, have, which they do not address). Yet, as Defendants acknowledge, these constitutional challenges are outside the scope of Article 78 proceedings and appeals to the Commissioner.

Reliance on procedural due process law about the adequacy of post-deprivation administrative remedies is misplaced – this case is about the constitutionality of the infringements themselves, regardless of what process those proceedings might have afforded.

**CONCLUSION**

Wherefore, Plaintiffs respectfully request that this Court deny the Defendants' motion to dismiss.

Respectfully submitted,

s/ *Sujata S. Gibson*

Sujata S. Gibson, Esq., *Lead Counsel*
The Gibson Law Firm, PLLC
407 N. Cayuga Street, Suite 201
Ithaca, NY 14850
Tel: (607) 327-4125
Email: sujata@gibsonfirm.law
Bar Roll No. 517834

Michael Sussman, Esq., *Lead Counsel*
**Sussman & Associates**
1 Railroad Ave, Suite 3, PO Box 1005
Goshen, NY 10924
Bar Roll No. 123324

*Of Counsel*
Robert F. Kennedy Jr., Esq., *pending admission*
Mary Holland, Esq., *pending admission*