**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JANE DOE, et al. | Civil Action No.: 1:20 – CV – 0840 (BKS/CFH) |
| Plaintiffs, | |
| vs. | **MEMORANDUM OF LAW** |
| HOWARD ZUCKER, et al. | |
| Defendants. | |

<u>**PLAINTIFFS' MEMORANDUM OF LAW OPPOSING FOURTH MOTION TO DISMISS**</u>

Sujata S. Gibson, Esq., *Lead Counsel*
**The Gibson Law Firm, PLLC**
407 N. Cayuga Street, Suite 201
Ithaca, NY 14850
Tel: (607) 327-4125
Email: sujata@gibsonfirm.law
Bar Roll No. 517834

Michael Sussman, Esq., *Lead Counsel*
**Sussman & Associates**
1 Railroad Ave, Suite 3, PO Box 1005
Goshen, NY 10924
Bar Roll No. 123324

*Of Counsel*
Robert F. Kennedy Jr., Esq., *pending admission*
Mary Holland, Esq., *pending admission*

November 10, 2020

## <u>TABLE OF CONTENTS</u>

Table of Contents..................................................................................................i

Table of Authorities ..............................................................................................ii

Preliminary Statement............................................................................................1

Statement of Facts..................................................................................................4

Standard of Review................................................................................................8

Legal Argument .....................................................................................................9

**I.      BROTHER MIGLIORINO ACTED UNDER COLOR OF STATE LAW AND SHOULD BE LIABLE FOR CONSTITUTIONAL VIOLATIONS....9**

**II.     EXHAUSTION OF REMEDIES IS NOT REQUIRED ..............................14**

**III.    THE CONSTITUTIONAL CLAIMS ARE FACIALLY SUFFICIENT TO WITHSTAND DISMISSAL.............................................................................15**

**IV.    THE REHABILITATION CLAIMS ARE FACIALLY SUFFICIENT TO WITHSTAND DISMISSAL.............................................................................18**

**V.      CHD HAS STANDING TO SUE.................................................................22**

CONCLUSION......................................................................................................25

## <u>TABLE OF AUTHORITIES</u>

<u>Cases</u>

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009)...................................................................................8

*Ayotte v. Planned Parenthood of N. New England,*
    546 U.S. 320 (2006)...................................................................................3

*B.C. v. Mount Vernon Sch. Dist.,*
    837 F.3d 152 (2d Cir. 2016).....................................................................19

*Bowden v. Iona Grammar School,*
    726 N.Y.S. 2d 685 (2001) ................................................................12, 14

*Brentwood Acad. V. Tennessee Secondary Sch. Athletic Ass'n,*
    531 U.S. 288, 295 (2001) ........................................................................10

*Brown v. Bd. of Ed. of Topeka, Shawnee Cty., Kan.,*
    347 U.S. 483 (1954) ................................................................................18

*Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay,*
    868 F.3d 104 (2d Cir. 2017) ...................................................22,23,24,25

*Cooper v. U.S. Postal Serv.,*
    577 F.3d 479 (2d Cir. 2009) ....................................................................10

*D.A.B. v. N.Y.C. Dept of Educ.,*
    45 F. Supp.3d 400 (S.D.N.Y. 2014)........................................................20

*Doe v. Bolton,*
    410 U.S. 179 (1973) ............................................................................2,5,9

*Doe v. Syracuse Univ.,*
    440 F. Supp. 3d 158 (N.D.N.Y. 2020) .....................................................9

*Easton v. Sundram,*
    947 F.2d 1011 (2d Cir. 1991)....................................................................9

*Fabrikant v. French,*
    691 F.3d 193, 207 (2d Cir.2012) .............................................................10

*Hayden v. County of Nassau,*

180 F.3d 42 (2d Cir.1999)....................................................................9

*Havens Realty Corp. v. Coleman*,
    455 U.S. 363 (1982) ...................................................................23

*Jacobson v. Massachusetts*,
    197 U.S. 11 (1905)........................................................2,3,16,17

*King v. Simpson*,
    189 F.3d 284 (2d Cir.1999)........................................................9

*Lugar v. Edmondson Oil Co.*,
    457 U.S. 922, 941 (1982) ........................................................12

*McCarthy v. Dun & Bradstreet Corp.*,
    482 F.3d 184, 191 (2d Cir. 2007) ...........................................9

*Mental Disability Law Clinic, Touro Law Center v. Hogan*,
    519 F. App'x 714, 717 (2d Cir. 2013) ...................................24

*Meyer v. Nebraska*,
    262 U.S. 390 (1923) .................................................................13

*Neitzke v. Williams*,
    490 U.S. 319 (1989).....................................................................9

*Nettis v. Levitt*,
    241 F.3d 186 (2d Cir.2001)........................................................9

*New York Civil Liberties Union v. New York City Transit Authority*,
    684 F.3d 286 (2d Cir. 2012) ....................................................22

*Nnebe v. Daus*,
    644 F.3d 147 (2d Cir. 2011) ....................................................23

*Olsen v. Stark Homes, Inc.*,
    759 F.3d 140 (2d Cir. 2014) ...............................................23,24

*Patsy v. Bd. of Regents of State of Fla.*,
    457 U.S. 496 (1982) .................................................................14

*Philips v. City of N.Y.*,
    775 F.3d 538 (2d Cir. 2015) ................................................16,17

iii

*Powe v. Miles,*
    407 F.2d 73,81 (2d Cir. 1968) ........................................................................ 13

*Reno v. Flores,*
    507 U.S. 292 (1993) ........................................................................................ 6

*Sarmiento v. U.S.,*
    678 F.3d 147 (2d Cir.2012) ........................................................................... 8,9

*Stenberg v. Carhart,*
    530 U.S. 914 (2000) ........................................................................................ 3

*Sybalski v. Indep. Grp. Home Living Program, Inc.,*
    546 F.3d 255, 257 (2d Cir.2008) .............................................................. 10,11

## **Statutes**

28 C.F.R. ........................................................................................................... 19

34 C.F.R. ........................................................................................................ 18,19

45 C.F.R. ........................................................................................................ 18,19

N.Y. P.H.L. §2164 ...................................................................................... 4,5,13,15

Rehabilitation Act of 1973 .......................................................................... 18,19,21

42 U.S.C. § 12182(b)(1)(DD) ........................................................................... 19

## **Federal Rules of Civil Procedure**

Fed. R. Civ. P. 65 ................................................................................................ 5

Fed. R. Civ. P. 8 ................................................................................................. 8

## **Other Authorities**

............................................................................................................................ 8

iv

Plaintiffs respectfully submit this memorandum of law in opposition to defendant Migliorino's motion to dismiss dated October 16, 2020, *See* Dkt. No. 91-1. In the interest of avoiding unnecessary replication, plaintiffs adopt and set forth arguments in their previous responses to the other motions to dismiss, filed at Dkt. 74, 83, and 100. For the reasons set forth in this memorandum of law and in plaintiffs' responses to the other pending motions to dismiss, the Court should deny defendant's motion.

## PRELIMINARY STATEMENT

Last year, the New York State Legislature repealed the religious exemption to child vaccine requirements long available under the New York Public Health Law. However, they expressly elected to keep the medical exemption intact without any changes or alterations.

Without direction from the Legislature and in contravention of this legislative decision not to amend the medical exemption, the New York State Department of Health implemented and began encouraging aggressive enforcement of new regulations beginning in August 2019 which substantially undercut the availability of the medical exemption for children who need it. Individual school districts and school principals went even further and adopted discretionary policies resulting in the removal of hundreds of medically fragile children across the state.

The challenged policies and practices, both on their face and as applied, unconstitutionally burden all families seeking a medical exemption, whether their child is ultimately removed from school or not. The challenged actions are arbitrary, capricious, and unjustified to further any legitimate state interest.

State level defendants dangerously imposed an inflexible definition of "what may cause harm," and guided schools to apply it in such a narrow way as to deprive treating physicians from using their best medical judgment and instead limiting them to the consideration of a small fraction of the long list of known serious adverse reactions recognized by the U.S. government,

the Institutes of Medicine and the manufacturers themselves. Individual school districts and private schools acting in concert with state actors have adopted policies and procedures which narrow the definition even further than the DOH regulations require and allow school principals to overrule treating physicians without even bothering to provide a reason or an opportunity to supplement the record in many instances.

Even when schools "rely on advice from their consultants" in overruling treating physicians, such infringements are not safe or appropriate. It is reckless to rely on consultants who arbitrarily exclude most categories of known harms and have never met the child or spoken with the parents. If the consultant does not agree with the treating doctor's determination or interpretation of the complex ACIP guidelines and evidence-based standards of care, school actors usurp parental decision making and "decide" even though they lack the qualifications or knowledge of the child to do so. Where there are differences of medical opinion from two licensed physicians, parents must decide.

The challenged policies will likely not withstand any level of judicial review. A sufficient medical exemption has been recognized as a prerequisite to any constitutionally-sound vaccine mandate for a hundred and fifteen years. *Jacobson v. Commonwealth of Massachusetts*, 197 U.S. 11 (1905). Controlling precedent from the U.S. Supreme Court expressly forbids burdens on medical exemptions which subordinate the professional judgment of treating physicians. *Doe v. Bolton,* 410 U.S. 179, 199-200 (1973)(striking down restrictions on a medical exemption substantially similar to the ones at issue, holding that the patient's chosen medical provider must have discretion in decisions about what may constitute harm: "*if a physician is licensed by the State, he is recognized by the State as capable of exercising acceptable clinical judgment*"). *Doe* held that it is unconstitutional to require corroboration of a licensed physician's opinion or to allow the chosen physician's best medical judgment to be overruled by other

2

licensed physicians or the state. Certainly, allowing a school principal to overrule the parents' chosen physician is unlawful under this binding precedent.

Medical exemption cases require strict scrutiny, and even where the possibility for harm alleged is only hypothetical and unlikely, the Supreme Court has deemed the exemption constitutionally insufficient. *Stenberg v. Carhart.* 530 U.S. 914, 937 (2000); *Ayotte v. Planned Parenthood of N. New England,* 546 U.S. 320, 325 (2006).

The allegations in this case establish violations of other fundamental rights as well – including the right to informed consent, fundamental parental rights, educational rights, equal protection rights, fundamental privacy rights. Defendants actions also violate the doctrine of unconstitutional conditions. It is well-settled law that if the state cannot take the action in the first place (that is forcing medically fragile children to submit to immunization against medical advice in cases where it might harm or kill them), they cannot get around it by trying to coerce families through denying the children an education. All of these rights require strict scrutiny and cannot be dismissed without independent inquiry from this Court.

Rather than address the clear constitutional issues, defendants allege that plaintiffs have failed to state a claim because the Supreme Court already decided that states may impose vaccine mandates in *Jacobson v. Commonwealth of Massachusetts*, 197 U.S. 11 (1905). However, that is not the issue before the Court.

This suit does not challenge *Jacobson's* holding that states can enact compulsory immunization requirements under certain circumstances. On the contrary, plaintiffs <u>rely</u> on *Jacobson,* which also expressly held that a sufficient medical exemption is a constitutional prerequisite to the state's use of its police power to impose any mandates. Just as a person's fundamental rights are not absolute and may be constrained by compelling state need under narrowly tailored circumstances, the state's interests are not unlimited either. *Jacobson*

made it very clear that a state can require the public to submit to a vaccine to protect the community, but not if the individual could face physical harm from the vaccine. *Id.* at 38-39.

Defendant Migliorino and other school district defendants attempt to sidestep responsibility, claiming that the state defendants are solely responsible for any unconstitutional policies and practices burdening the medical exemption, alleging the schools are simply administering the law. However, this is a contested factual issue and at this stage, the plaintiffs have met their burden of pleading a plausible claim that the schools are not simply following a non-discretionary mandate. In fact, as plaintiffs allege, under the new regulations, school principals and individual districts are empowered to overrule physicians but *are not required to do so.* So long as a child has a medical exemption certified by a licensed physician, the school does not have to go further and attempt to contravene the good-faith medical determinations of licensed doctors chosen by the fit parents of medically fragile students in their schools. Nor do they have to ask families to seek corroborating opinions from multiple specialists, or "ensure" the treating doctor got it right or ask for additional documentation. The named districts have chosen to engage in these behaviors, often in outrageous and conscience shocking degrees. As the evidence will show, each of these named defendant districts have adopted policies that narrow the grounds for a medical exemption even more than the DOH regulations allow.

In sum, plaintiffs' complaint establishes multiple viable causes of action and should not be dismissed.

## STATEMENT OF FACTS

Pursuant to Public Health Law §2164 ("PHL §2164), all parents of children between the ages of two months and eighteen years are required to have administered over fifty doses of immunization to their child at various specified intervals during childhood. PHL 2164(2). The statute does not limit this requirement to children who attend school – it is an obligation that all

parents have to follow under the plain language of the statute, whether a child attends school or not. School is implicated because PHL §2164 also imposes requirements on school principals, or "persons in charge of a school"(whether public or private) to ensure that the child has submitted either a certificate of immunization for all age-appropriate doses required under the statute, or a certification from a doctor licensed to practice in New York exempting the child from the requirement.

The statutory medical exemption is broad and deferential, stating: "If any physician licensed to practice medicine in this state certifies that such immunization may be detrimental to a child's health, the requirements of this section shall be inapplicable."

The New York legislature reached the limits of permissible infringements on the medical exemption in enacting Public Health Law §2164(8). This language exactly tracks with the requirements for medical exemptions and the rights of patients to make medical decisions in accordance with the best medical judgment of their chosen physician set forth by the Supreme Court in *Doe v. Bolton*, 410 U.S. 179 (1973). Last year, the DOH adopted and defendants began widely implementing additional regulations which violate the principals set forth in *Doe*.

First, they arbitrarily remove the determination of what may cause harm from the treating physician, substituting instead a narrow set of circumstances, pre-defined by the CDC's "ACIP guidelines." The ACIP guidelines are not exhaustive and cannot be substituted for the clinical judgment of a trusted treating physician. *See* Dkt 1 (complaint) ¶¶267-301; *see also* email from CDC representative to parent plaintiff): "The ACIP guidelines were never meant to be a population-based concept…The CDC does not determine medical exemptions. We define contraindications. It is the medical providers prerogative to determine whether this list of conditions can be broader to define medical exemptions." *See* Dkt 1 (complaint) ¶268.

Second, under the new regulations, school principals are given the option of exercising state delegated authority to determine whether to accept the medical exemption submitted by a licensed physician and to burden the constitutionally protected privacy rights inherent in the doctor-patient relationship by engaging in invasive review. Though they are not required to do more than verify that a treating physician signed the exemption and put it on the correct form, all of the defendants in this suit elected to take advantage of this optional exercise of the state's police power. Private schools that elect to exercise this new delegation of authority typically work with state actors – either the non-treating school district employed consultants or non-treating (and often non-practicing) physicians from the New York State department of health – to get second opinions on the medical decisions of treating physicians.

As a result, children who have had medical exemptions for years were suddenly and arbitrarily expelled from school last year.

The complaint alleges that defendant Migliorino, the Principal in charge of St. Anthony's, a private Catholic school, worked jointly with state actors to unconstitutionally deny three exemption requests, written by two trusted treating specialists, submitted by the family of named plaintiff John Loe ("John"). *See* Dkt 1-1 (complaint) par. 230-261. As more fully set forth in the complaint, John is a medically fragile fifteen-year-old boy who has had a medical exemption since he was seven. From age seven until last year, he was under the care of the same pediatric neurologist whose medical exemption requests were accepted each year without issue.

Last year, defendant Migliorino arbitrarily changed course and denied John's exemption on the advice of a school district employed doctor who has never met John and has no expertise in his multiple serious medical conditions. The complaint details how the consultant recommended denial based on unconstitutional and erroneous interpretations of the regulations.

Defendant Migliorino was in no way obligated to seek out or follow the advice of the

6

school district's non-treating physician. Nonetheless defendant Migliorino elected to utilize discretionary delegation of the state's police power and remove John from school on the basis of the consultant's grossly negligent opinion and in coordination with other state actors.

The consultant recommended denial of the first exemption submitted, claiming John was "no longer a patient" at his long-time specialist's office by the time school started (which is not a requirement under the regulations). The circumstances suggest that the consultant harassed and frightened John's long-time doctor into dropping him as a patient, which occurred just after the call with the consultant. John thus lost not only the right to attend school, but also lost his longtime trusted physician who had helped him so much over the years with his serious medical needs.

Over the next months, John's parents searched for a new doctor and by a miracle got an appointment with a second specialist with expertise in John's serious health conditions. This specialist agreed that John could not receive the fifth Tdap booster or the meningococcal vaccine safely (John is fully up to date otherwise). Again, defendant Migliorino denied this second exemption, claiming erroneously that the law required that the specialist provide two separate forms (the regulations do not require this). This second denial was also made with significant participation and collaboration with the state – both through the school and the department of health. The second specialist reported being called by the department of health and "encouraged" to deny any further exemptions even for children who require one. He expressed fear of retaliation when he signed the third set of forms.

Defendant Migliorino then elected to deny the third set of exemption forms after months of delay "considering them" (while John was excluded from class) on the grounds that John's new specialist couldn't "sufficiently defend" the medical exemption over the phone, according to the consultant. This has been deeply invasive. John is scared he will now lose a second much needed specialist if he subjects his doctor to this process again this year.

7

John and his family have suffered irreparable ongoing harm as a result of these events. It was a huge achievement for John to get accepted to St. Anthony's school, and it meant everything to him. Because of his condition, he struggles socially, physically, and mentally. He was just starting to feel accepted, to make friends, to find a place for himself and gain some fragile sense of confidence, destroyed after all these years of serious illness. For the first time, he felt he had a future and he was eagerly trying to pursue it.

No component of the Tdap or the meningococcal vaccine can protect anyone else than the recipient, thus there is no possibility of impacting herd immunity negatively by having John in the school without these vaccines. As certified by two treating specialists, the risks for John are too great for any purported personal benefit.

The developmental impacts of ostracization and removal from school devastated John. He fell into a deep and serious depression. He was not even allowed to attend the PSAT prep course and fell behind. He lost the will to try.

## STANDARD OF REVIEW

**Failure to State a Claim:** "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Sarmiento v. U.S.,* 678 F.3d 147 (2d Cir.2012)(quoting *Ashcroft v. Iqbal,* 556 U.S. 662, 678, (2009)). While Rule 8(a) of the Fed.R.Civ.P, which sets forth the general rules of pleading, "does not require detailed factual allegations ... it demands more than an unadorned, the-defendant-harmed-me accusation." *Id*.

In considering a motion to dismiss for failure to state a claim pursuant to Fed.R.Civ.P. 12(b)(6), "the Court must accept all factual allegations of the complaint as true, and draw all

reasonable inferences in favor of the nonmoving party." *Hayden v. County of Nassau,* 180 F.3d 42, 54 (2d Cir.1999); *Sarmiento v. United States,* 678 F.3d 147, 152 (2d Cir. 2012).

The Court's review on a motion to dismiss is ordinarily limited to "the facts as asserted within the four corners of the complaint, the documents attached to the complaint as exhibits, and any documents incorporated in the complaint by reference." *Doe v. Syracuse Univ.,* 440 F. Supp. 3d 158, 172 (N.D.N.Y. 2020) citing *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007).

The Court may not dismiss the complaint unless it is certain that plaintiffs can prove no set of facts that would entitle them to relief. *Neitzke v. Williams,* 490 U.S. 319, 326-27 (1989); *Nettis v. Levitt,* 241 F.3d 186, 191 (2d Cir.2001). Therefore, the issue before the Court on such a motion "is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *King v. Simpson,* 189 F.3d 284, 287 (2d Cir.1999). This caution against dismissal applies with even greater force where plaintiffs allege civil rights violations. *Easton v. Sundram*, 947 F.2d 1011, 1015 (2d Cir. 1991).

## **LEGAL ARGUMENT**

### I.   **BROTHER MIGLIORINO ACTED UNDER COLOR OF STATE LAW AND SHOULD BE LIABLE FOR CONSTITUTIONAL VIOLATIONS**

Counsel for Brother Migliorino argue that the constitutional claims against him should be dismissed because, as principal of a private school, his actions are, as a matter of law, exempt from constitutional scrutiny. This is an oversimplification of the state action doctrine and incorrect in this instance.

First, there is no bright line rule exempting specific types of private entities or actors from the definition of "acting under color of state law." "In analyzing whether a private entity acts under color of state law for purposes of § 1983, we begin by identifying the specific conduct of

which the plaintiff complains, rather than the general characteristics of the entity." *Fabrikant v. French,* 691 F.3d 193, 207 (2d Cir.2012) (internal quotation marks omitted). Thus, the fact that private school actors may have been found not to be state actors under one set of facts does not suggest the same result will occur under another set of facts.

There is "no single test to identify state actions and state actors. Rather, there are a host of factors that can bear on the fairness of an attribution of a challenged action to the State." *Fabrikant,* 691 F.3d at 207 (quoting *Cooper v. U.S. Postal Serv.,* 577 F.3d 479, 491 (2d Cir.2009)). The primary judicial obligation in determining whether to categorize conduct as state action is to "avoid the imposition of responsibility on a State for conduct it could not control" but also to "assure that constitutional standards are invoked 'when it can be said the State is responsible for the specific conduct of which the plaintiff complains." *Brentwood Acad. V. Tennessee Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295 (2001)(holding that private athletic association was acting under color of state law due to pervasive entwinement of state school officials in the conduct at issue).

Three main themes have emerged from the case law. For the purposes of section 1983, the actions of a nominally private entity are attributable to the state depending on … (1) the source of the authority for private action – particularly in instances in which "the entity acts pursuant to the coercive power of the state or is controlled by the state" ("the compulsion test"); (2) whether the state provides significant encouragement to the entity, the entity is a willful participant in joint activity with the state, or the entity's functions are entwined with state policies ("the joint action test" or "close nexus test"); or (3) whether the entity has been delegated a public function by the state ("the public function test"). *Sybalski v. Indep. Grp. Home Living Program, Inc.,* 546 F.3d 255, 257 (2d Cir.2008) (internal quotation marks, brackets, and punctuation omitted).

10

Fundamentally, under any of the tests, it is not enough for a plaintiff to "plead state involvement in some activity of the institution which is alleged to have inflicted injury upon a plaintiff; rather, the plaintiff must allege that the state was involved with the *activity that caused the injury* giving rise to the action." *Sybalski,* 546 F.3d at 257–58.

This case presents clear state entanglement sufficient to find state action in the burdens placed on John's medical exemption. First, the state was directly involved with the activity that caused the injury to John and acted jointly along with defendant Migliorino in inflicting the constitutional harm.  In fact, the state's participation in the determination to deny John's medical exemption was so significant that defendant Migliorino claims the state is entirely responsible for the decision. This is contested, and doesn't excuse defendant Migliorino of his joint participation with the state to deprive John of constitutional rights. Pursuant to the regulatory scheme, defendant Migliorino was deputized to make the final determination in cases where a state consultant disagreed with the treating physician. Even if he abdicated that responsibility and enforced the hired state consultant's unconstitutional recommendation to apply requirements to the medical exemption that do not exist by statute or regulation, he has to be liable for that decision and the harm it has caused. However, the argument necessarily concedes a significant entanglement between state and private actors in the challenged actions.

Moreover, state employed actors were not only involved but jointly acted in this deprivation of rights, and it would considerably frustrate the ability of plaintiffs to challenge the alleged unconstitutional state action if private school defendants were unable to be sued along with them. The state could then attempt to rely on the regulatory scheme, and point out that whatever the state actor's recommendation might be, the school principal had the final responsibility and authority to decide, so the state should not be liable for imposing unconstitutional conditions on the medical exemption, or arbitrarily narrow standards. Precisely

11

to avoid this type of abdication of responsibility in cases of coordinated action, the Supreme Court expressly held that joint action between a private individual or entity and the state constitutes action under color of state law. "Private persons, jointly engaged with state officials in the prohibited action, are acting "under color" of law for purposes of the statute. To act 'under color' of law does not require that the accused be an officer of the State. It is enough that he is a willful participant in joint activity with the State or its agents" *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 941 (1982)(citations omitted).

Second, the source and nature of the powers delegated counsel in favor of finding state action. Normally, schools cannot and do not interfere with medical decisions made between doctor and patient and are not empowered to set forth vaccine requirements. Similarly, without special powers delegated from the state, private schools are not allowed to more narrowly define statutory exemptions provided by the New York State Legislature governing vaccine requirements.

In *Bowden v. Iona Grammar School,* a New York appellate court struck down a private school's contention that they were immune from suit challenging their application of more stringent requirements than provided in the public health law for analysis of the religious exemption to vaccines. 726 N.Y.S. 2d 685 (2001)*. In holding that private schools could be sued for their unauthorized application of new, more narrow immunization exemption requirements, the Appellate Division upheld an injunction from the lower court, stating, "[t]he Supreme Court properly granted plaintiffs motion for a preliminary injunction. The plaintiffs established a likelihood of success on the merits. In denying the plaintiffs a religious exemption on the ground that they were not members of a recognized religious organization, the appellants disregarded the statutory criteria and applied [an unconstitutional standard] *Id.* (noting the narrower interpretation of religion was found unconstitutional in *Matter of Sherr v. Northport-East Northport Union Free*

*School Dist.*, 672 F. Supp. 81).

The power to narrow and enforce immunization requirements arises under the police powers of the state. In granting school principals the right to overrule doctors and invade the doctor-patient relationship, the state has delegated exercise of its police powers to the schools – both public and private.

The regulatory scheme provides evidence of state action as it regulates and delegates authority over the conduct that caused the injury rather than other conduct applicable to the private entity. In *Powe v. Miles,* the Second Circuit held that New York's regulation of educational standards in private schools was not enough to find state action when a private university unconstitutionally curtailed student political protest activities. 407 F.2d 73,81 (2d Cir. 1968). In so holding, the court held that such reasoning "overlooks the essential point – that the state must be involved not simply with some activity of the institution alleged to have inflicted injury upon a plaintiff but with the activity that caused the injury. Putting it another way, the state action, not the private action, must be the subject of the complaint." Thus, the Second Circuit held that if a state were to ban a subject from the curriculum at a private school, the ban could be state action even if carried out by a private school. *Id.* citing *Meyer v. Nebraska,* 262 U.S. 390 (1923). Moreover, that court found that the unconstitutional practices could be found to be state action if the regulatory scheme was directed at making policy for the control of demonstrations: "state action would be similarly present here with respect to all the students if New York had undertaken to set policy for the control of demonstrations in all private universities." *Id.*

This case presents precisely the type of regulations that *Powe* referenced as giving rise to a finding of state action by a private school. Here, New York has undertaken to set policy for the control of medical exemptions at all private schools and the regulations and the delegation of authority to school principals to harmfully and arbitrarily enforce the policies are the source of

the injuries claimed. In granting school principals – both public and private – the right to exercise state police powers to burden the medical exemption and overrule doctors, the state has exercised a delegation of authority sufficient so that actions undertaken through this mantle of authority are taken under color of state law, with direct participation and entanglement of state actors.

## II.    EXHAUSTION OF REMEDIES IS NOT REQUIRED

Defendant Migliorino next argues that plaintiff Jane Loe (John's mother) cannot bring suit because she "failed to exhaust the state administrative remedies available to her" in rectifying the violations of her son's constitutional rights. Dkt 91-1 at 12 of 23. Defendant asserts that before filing suit in federal court, Loe would need to bring an appeal to the Commissioner of Education and then an Article 78 petition first. Since both an appeal to the Commissioner and an Article 78 action are time-barred at this point, it appears defendants assert that Loe is therefore ineligible for any relief from the violation of her son's and her constitutional rights even though she brought suit well within the statute of limitations for a Section 1983 action. This is a wild misapplication of law.

The constitutional challenges at issue in this case are outside the scope of review under Article 78 proceedings and appeals to the Commissioner. Cases involving procedural due process law about the adequacy of post-deprivation administrative remedies are inapposite– this case is about the constitutionality of the infringements themselves, regardless of what process or proceedings might have been afforded. It is beyond debate that exhaustion is not required in §1983 cases of this nature. *Patsy v. Bd. of Regents of State of Fla.,* 457 U.S. 496, 500 (1982)(Federal claims premised on § 1983 do not require exhaustion of state judicial or administrative remedies, in recognition of the paramount role Congress has assigned to the federal courts in protecting constitutional rights.)

Moreover, courts have expressly held that appeals to the Commissioner are not required

in challenges to the application of the immunization laws whether or not they implicate constitutional challenges to a regulation. *See, e.g., Bowden v. Iona Grammar Sch.,* 726 N.Y.S. 2d 685,586-87 (2001)("[P.H.L. §2164] provides that a decision prohibiting a child from attending school may be reviewed by the Commissioner of Education" but "An appeal to the Commissioner, however, is not mandatory and is not the exclusive means of review.").

In addition to lacking legal support, requiring "exhaustion" through expensive and futile appeals to the Commissioner (who lacks jurisdiction to hear the constitutional claims) before allowing a plaintiff to bring a suit in federal court would result in injustice. Two of the named plaintiffs did bring such appeals within the thirty days allotted by statute. One is still awaiting an answer, over a year later. The other did not receive an answer until after filing this lawsuit and then received an answer that acknowledged that review of the constitutionality of the regulations was beyond the scope of the Commissioner's jurisdiction. Meanwhile, the children have been deprived of an education and severely harmed. Federal court is the appropriate forum for review of the constitutionality of the regulations and policies, facially and as applied.

### III.    THE CONSTITUTIONAL CLAIMS ARE FACIALLY SUFFICIENT TO WITHSTAND DISMISSAL

Defendants propose that there are no fundamental rights at stake in this case and that the complaint should be dismissed for failing to allege any constitutional claims. Plaintiffs' complaint clearly articulate the violation of multiple fundamental rights that require strict judicial scrutiny, including, but not limited to: the right to life, the right to informed consent, the right to refuse medical treatment, fundamental parental and educational rights, equal protection rights, and privacy rights including the constitutionally protected right to protection from infringement on the doctor-patient relationship. All of these rights are implicitly contained in the separate and well-established right to a medical exemption from any regulation, whether

otherwise permissible or not, that a licensed physician has certified may cause a person harm or death. In the interests of efficiency, plaintiffs incorporate by reference the three memoranda of law at Dkt 74, Dkt 83 and Dkt 100, filed in opposition to the proceeding motions to dismiss in this case which more fully address the constitutional claims alleged.

In addition to the arguments set forth in the previous memoranda of law in opposition to the other defendants' motions to dismiss, plaintiffs stress the following points.

First, in this motion, counsel fundamentally misapplies the holding of *Philips* and *Jacobson* in their arguments. As more fully discussed in the other briefs, *Jacobson* was not an unlimited grant of authority or a grant of total abdication of judicial review in deference to the state's decision-making for matters concerning vaccines. Rather, the Court articulated a fundamental distinction between judicial review of the cost-benefit analysis for the population as a whole, and judicial review over the cost-benefit analysis for the individual in situations where an individual has alleged that they are at risk of harm to their health or life. *Jacobson v. Commonwealth of Massachusetts,* 197 U.S. 11 (1905)(holding that the police powers of a state can be broad enough in certain circumstances to override personal liberty interests but vaccine mandates cannot apply to people who are at risk of serious harm or death from a vaccine). Essentially, the Court in *Jacobson* held that in the context of considering what might be sound public policy for the population as a whole, when no individual's safety or health was alleged to be at risk, the Court would defer to the state's decision about whether immunization is the most effective way to combat a public health emergency for the good of society. However, if an individual alleged that they were at serious risk of personal harm to their health or life from the vaccine, not just infringement on liberty interests, then the Court held that it is the responsibility, not just the right, of the judiciary to independently review such cases without affording deference. *Id.* at 39.

16

In *Philips v. City of N.Y.,* the Second circuit correctly applied this distinction. 775 F.3d 538, 542 (2d Cir. 2015). In *Philips,* plaintiffs raised essentially the same claim that the plaintiff in *Jacobson* had raised in 1905 – that is, they raised a challenge to the state's judgment that "mandatory vaccination was **in the interest of the population as a whole**." The Second Circuit held that that type of population-based cost-benefit analysis is a function of state government. This is consistent with *Jacobson*, which held that judicial scrutiny is reserved for cases that challenge the sufficiency of the State's determination of need against an individual's need for a medical exemption. In such cases, the Court's held that any law that did not allow a person to opt out if they were at risk of serious harm would be cruel and inhuman to the last degree and thus any state purpose would be insufficient to justify the mandate as against that medically fragile individual.

Second, defendant Migliorino's argument that the court abstain from review because he hired a consultant whose opinion should receive deference is misplaced. *Jacobson* clarified that courts cannot abdicate independent review of such cases. Subsequent case law discussed in the other briefs incorporated here further clarifies that not only are courts forbidden from avoiding independent judicial review in medical exemption sufficiency cases, but that the precise practices employed here by defendant Migliorino, including but not limited to his decision to recklessly second guess the licensed physician's recommendations, and to usurp the parents right to make medical decisions in cases where there are conflicting medical opinions by licensed physicians even though he is unqualified to do so, have been held unconstitutional.

Third, plaintiffs object to defendant Migliorino attempts to introduce facts which are disputed and are not in the complaint or supporting documents. Specifically, plaintiffs object to the consideration of his declaration in support of the motion to dismiss (Dkt 9-2) and any other assertion of fact in the moving papers, such as the erroneous assertion that there "is no dispute"

plaintiffs were sufficiently informed of the risks and benefits of vaccines by the non-treating physicians. Plaintiffs specifically assert that taking the decision from their treating physicians, and allowing non-treating consultants who have never counseled them or spoken to them about the risks and benefits of contravening their treating physician's advice deprives them of the ability to exercise informed consent. At this stage, contested facts must be resolved in favor of plaintiffs.

## IV.   THE REHABILITATION CLAIMS ARE FACIALLY SUFFICIENT TO WITHSTAND DISMISSAL

Plaintiffs sufficiently pleaded viable claims under the Rehabilitation Act and have established that their equal protection rights have been violated.

Pursuant to *Brown v. Board of Education,* though a state may not be required to provide a public education system, once they have elected to provide one, they are strictly prohibited from withholding it based on protected status. *Brown v. Bd. of Ed. of Topeka, Shawnee Cty., Kan.,* 347 U.S. 483 (1954*), supplemented sub nom. Brown v. Bd. of Educ. of Topeka, Kan.*, 349 U.S. 294 (1955)*.*

> Today, education is perhaps the most important function of state and local governments. Compulsory school attendance laws and the great expenditures for education both demonstrate our recognition of the importance of education to our democratic society. It is required in the performance of our most basic public responsibilities, even service in the armed forces. It is the very foundation of good citizenship. Today it is a principal instrument in awakening the child to cultural values, in preparing him for later professional training, and in helping him to adjust normally to his environment. In these days, it is doubtful that any child may reasonably be expected to succeed in life if he is denied the opportunity of an education**. Such an opportunity, where the state has undertaken to provide it, is a right which must be made available to all on equal terms**. *Id.* (emphasis added).

Section 504 of the Rehabilitation Act of 1973 provides this protected status to disabled children and strictly prohibits schools (public or private) that receive federal financial assistance from discriminating on the basis of disability with respect to admission to or participation in

18

their programs and activities. 34 C.F.R. §§ 104.42 and 104.43; 45 C.F.R. §§ 84.42 and 84.43. In addition, schools are prohibited from using criteria or methods of administration that have the effect of discriminating or tend to screen out an individual with a disability, or any class of people with disabilities. 42 U.S.C. § 12182(b)(1)(DD); 28 C.F.R. § 35.130(b)(3); 34 C.F.R. § 104.4(b)(4); 45 C.F.R § 84.4(b)(4). The ADA and Section 504 also require covered entities to make reasonable modifications to their policies, practices, or procedures when necessary to avoid discrimination on the basis of disability, unless such modifications would fundamentally alter the nature of the program or the services provided. 28 C.F.R. § 36.302; 28 C.F.R. § 35.130(b)(7); 34 C.F.R. § 104.44(a); 45 C.F.R. § 84.44(a).

"To establish a prima facie case of discrimination under either the ADA or Section 504, a plaintiff must show the following: (1) plaintiff is a "qualified individual with a disability;" (2) plaintiff was "excluded from participation in a public entity's services, programs or activities or was otherwise discriminated against by [the] public entity;" an (3) "such exclusion or discrimination was due to [plaintiff's] disability. *B.C. v. Mount Vernon School,* 837 F.3d 152, 158 (2d Cir. 2016)(citations omitted). In connection with the second prong: "(e)xclusion or discrimination may take the form of disparate treatment, disparate impact, or failure to make a reasonable accommodation." *Id*.

John alleges that due to his disability, he is unable to safely receive any more immunizations per the certification of two licensed physicians who are specialists in treating his particularly severe diagnosed and undiagnosed conditions. The complaint establishes that defendant Migliorino excluded him from participation in school based on his disability. Moreover, he alleges he has been discriminated against on the basis of disparate treatment, disparate impact and failure to make a reasonable accommodation and denied his equal protection rights pursuant to the enforcement mechanisms of the Rehabilitation Act of 1973.

Defendants argue that the John cannot prevail because he cannot show that he was excluded from participation in benefits due to his disabilities. Defendants misapply *D.A.B. v. N.Y.C. Dept of Educ.*, 45 F. Supp.3d 400 (S.D.N.Y. 2014) for the proposition that vaccination requirements cannot constitute discrimination based on disability. However, *D.A.B.* actually supports plaintiffs in this case.

The court in *D.A.B.* specifically relied upon the availability of a sufficient medical exemption to conclude that the challenged regime would not likely be deemed discriminatory. Though this issue wasn't before the court, in dicta, the court speculated that the vaccine requirement was unlikely to be found discriminatory, as there was a medical exemption available if the child could not safely take the vaccine because of his medical disability. *D.A.B.,* 45 F. Supp. 3d at 407. The child in D.A.B. never presented a certification from a physician to the school to apply for a medical exemption or argued that he was unable to get a vaccine due to medical reasons. If he had (before the new arbitrary regulations were imposed) he would have been able to get a medical exemption so long as a licensed physician agreed.

The issue here is the opposite – here, plaintiffs allege that the new regulations and the policies and practices of individual school districts narrow medical exemption criteria so much that most acknowledged harms and conditions are no longer covered, thereby depriving whole categories of disabled children from receiving their needed medical exemption. Thus, the solution proposed by D.A.B. – that the child simply obtain a medical exemption if his disability prevents him from getting immunized – is no longer available to most medically fragile children. Defendant Migliorino, acting together with the South Huntington School District, refused to consider the substantial nationally recognized evidence supporting an exemption for children with John's medical conditions and instead elected to make the decision based on a narrow and unconstitutional reading of the ACIP guidelines. Thus, those children with disabilities that fall

outside of the non-exhaustive easily defined ACIP contraindications, such as John, are discriminated against and denied benefits to which they are otherwise entitled. Plaintiffs have made a *prima facie* case that the restrictions are overly narrow and plausibly unlawful. These policies are discriminatory and disparately impact medically fragile children with disabilities that fall outside of the narrow list of ACIP contraindications and precautions.

Defendants also questions whether John is disabled. He is. Section 504 of the Rehabilitation Act defines "disability" as any physical or mental impairment that "substantially limits one or more major life activities" including the functioning of the immune system. Individuals with a history of their specific impairment or who are regarded as having an impairment will also be extended protection. John has multiple significant impairments documented by his licensed physicians. In addition to other debilitating conditions, he suffers from significant impairment of his immune system that prevents him from being able to be safely immunized with any more doses of the required childhood vaccines.

Absent a showing that John poses a direct threat to his classmates, which must be reviewed under an exacting standard, his special needs must be accommodated. In determining whether an individual poses a direct threat in a Section 504 accommodation determination, objective evidence must be reviewed in order to overcome the potential for prejudice. Courts have overruled arguments that children who are actively infected with hepatitis b, for example, pose any substantial or direct threat to classmates sufficient to permit a school to exclude them.

Here, there is no argument that John could pose a direct threat to his classmates due to his immunization status. It is unrefuted that the only vaccines he is missing are incapable of providing protection from replication and transmission of disease to others. They are in the category of vaccines that can provide personal protection only and thus John cannot pose any direct threat to any other student if allowed to attend school without them.

21

## V.      CHD HAS STANDING TO SUE

Children's Health Defense ("CHD") sufficiently articulated organizational and associational standing in the proposed amended complaint. Dkt. 93-1 ¶¶57-63.

"An organization can have standing to sue in one of two ways." *New York Civil Liberties Union v. New York City Transit Authority*, 684 F.3d 286, 294 (2d Cir. 2012). First, it can have "associational" or "representational" standing to sue on behalf of its members. *Id.* Second, it can have "organizational" standing to sue on its own behalf. *Id.*

To sue in its own right, an organization must satisfy "the same standing test that applies to individuals." Id. (quotation marks omitted). That is, an organization must establish that it has suffered a "distinct and palpable" injury that is "fairly traceable" to the defendant's challenged conduct and that would be redressed by a favorable decision. *Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*, 868 F.3d 104, 109 (2d Cir. 2017) (internal quotation marks omitted).

CHD plausibly alleges that it meets the first element of organizational standing because it has had to divert resources away from other of its activities to challenge the defendant's allegedly unconstitutional conduct. Specifically, and in addition to other allegations, the proposed amended complaint alleges that "CHD and its professional members have expended substantial time and resources they would have devoted to other work on behalf of medically fragile children in order to respond to requests for assistance concerning the inappropriate denial or unconstitutionally burdensome requirements placed on the medical exemption process in New York. CHD has also had to spend substantial money on litigation that could have been used to work on other initiatives to protect children."

It is well settled law that a drain on an organization's resources can give rise to associational standing. *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982)( an organization

22

suffers a cognizable injury sufficient to establish standing where a defendant's conduct perceptibly impairs the organization's activities including through imposing a "drain on the organization's resources.").

In the Second Circuit "only a perceptible impairment' of an organization's activities is necessary for there to be an 'injury in fact.'" *Centro*, 868 F.3d at 110 (internal quotation marks omitted). The Second Circuit has repeatedly reaffirmed that a "perceptible impairment" occurs where an organization diverts resources away from some of its activities in order to respond to a defendant's conduct. *Nnebe v. Daus*, 644 F.3d 147, 157 (2d Cir. 2011).

Several Second Circuit illustrate and affirm these principles. In *Nnebe v. Daus*, the court concluded that the New York Taxi Workers Alliance had standing to challenge New York City's procedures for suspending some taxi drivers' licenses following an arrest because the organization had expended resources counseling and assisting impacted drivers. 644 F.3d at 157. The fact that the Alliance expended relatively "scant" resources on such counseling and assistance was irrelevant. *Id*. The court explained: "Even if only a few suspended drivers are counseled by NYTWA in a year, there is some perceptible opportunity cost expended by the Alliance." *Id.* (citing *Havens Realty*, 455 U.S. at 379). Similarly in this case, CHD pleaded that it has expended time and resources they would have devoted to other work on behalf of medically fragile children in order to respond to request for assistance and counseling for members deprived of their constitutional right to a medical exemption by defendants' conduct.

In *Olsen v. Stark Homes, Inc*., 759 F.3d 140 (2d Cir. 2014), the court found that Long Island Housing Services (LIHS) had standing to sue a residential community for discriminating against a couple whose son was disabled because LIHS had expended resources responding to the discrimination. Specifically, LIHS wrote a letter to the community on the couple's behalf after they faced discriminatory conduct and filed an administrative complaint. *Id*. at 143-144. LIHS

23

noted that its resource expenditures on behalf of the couple required a diversion of resources "from its other advocacy and counseling activities." *Id*. at 158. The Second Circuit held that LIHS's diversion of resources reflected a demonstrable "concrete and particularized injury" that conferred organizational standing. *Id*. CHD has alleged almost identical diversion of time and resources here.

In *Centro de la Comunidad de Locust Valley v. Town of Oyster Bay*, the Second Circuit concluded that the Workplace Project, an organization dedicated to advancing the interests of day laborers, had standing to challenge a local ordinance prohibiting roadside employment solicitation, in part because the Project expended resources responding to the ordinance and in part because it might disperse some of its members out of the area making them harder to organize. 868 F.3d at 110-111. The Second Circuit held that all of the reasons constituted injury sufficient for organizational standing. With respect to the diversion-of-resources injury, the court reiterated once again: "Where an organization diverts its resources away from its current activities, it has suffered an injury that has been repeatedly held to be sufficient to confer organizational standing." *Id.* at 111. Here, CHD has identical concerns. In addition to spending time, money and resources responding to the challenged policies and actions, CHDs members are forced to disburse and leave the area after being removed from school, making it harder to organize and support them.

Finally, CHD's diversion of resources into litigation efforts to protect children from defendants' unconstitutional and harmful practices is an independent reason for granting standing. *Mental Disability Law Clinic, Touro Law Center v. Hogan*, 519 F. App'x 714, 717 (2d Cir. 2013) (law clinic had standing to challenge the New York State Office of Mental Health's practice of filing counterclaims against patients who sued the Office, because the law clinic had "diverted resources from education and training" programs to pursue affirmative litigation against the Office's practice).

These facts, which at this stage of the case must be taken as true, demonstrate that the defendants' conduct has perceptibly impaired CHD's activities by causing it to expend resources it "could have allocated elsewhere." Such impairment constitutes an injury in fact. See, e.g., Centro, 868 F.3d at 111 (stating that "where an organization diverts its resources away from its current activities, it has suffered an injury").

## CONCLUSION

Wherefore, plaintiffs respectfully request that this Court deny the defendant's motion to dismiss.

Respectfully submitted,

s/Sujata S. Gibson
Sujata S. Gibson, Esq., *Lead Counsel*
The Gibson Law Firm, PLLC
407 N. Cayuga Street, Suite 201
Ithaca, NY 14850
Tel: (607) 327-4125
Email: sujata@gibsonfirm.law
Bar Roll No. 517834

Michael Sussman, Esq., *Lead Counsel*
**Sussman & Associates**
1 Railroad Ave, Suite 3, PO Box 1005
Goshen, NY 10924
Bar Roll No. 123324

*Of Counsel*
Robert F. Kennedy Jr., Esq., *pending admission*
Mary Holland, Esq., *pending admission*